**THE FOX LAW CORPORATION, INC.**
Steven R. Fox, California SBN 138808
srfox@foxlaw.com
17835 Ventura Blvd., Suite 306
Encino, CA 91316
(818) 774-3545; FAX (818) 774-3707

**THE LAW OFFICES OF KEITH Y. BOYD**
Keith Y. Boyd, OSB #760701
keith@boydlegal.net
724 S. Central Ave., Suite 106
Medford, OR 97501
(541) 973-2422; FAX (541) 973-2426

Of Attorneys for Debtor in Possession

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>Creekside Homes, Inc.,<br><br>        Debtor. | Case No. 17-33893-tmb11<br><br>**PLAN CONFIRMATION MEMO-RANDUM FOR CONFIRMATION HEARING AND REQUEST THAT THE COURT APPROVE NON-MATERIAL MODIFICATION** |

The Debtor, as Plan Proponent ("Proponent" or "Debtor") proposed the Original Plan of Reorganization as modified (docket no. 166) (the "Plan").

The Debtor believes the Plan meets the requirements of 11 U.S.C. §1129(a) and should be approved. At least one impaired class has voted to accept the Plan and the Plan meets the best interests of creditors test. The attached Memorandum

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification     **Page 1 of 25**

Case 17-33893-tmb11   Doc 169   Filed 06/04/18

addresses §1129's requirements.

In addition, the Debtor has made one non-material change to the Plan by copying over from the Disclosure Statement language concerning the LeGrady's claim and its payment. The change is non-material as it affects no other creditor and will have no impact on feasibility of the Plan.

Objections to the Plan are addressed in the Memorandum.

**WHEREFORE** the Proponent requests that the Court:

1.     Find that the Plan satisfies §1129 and other applicable sections of the U.S. Bankruptcy Code and confirm the Debtor's proposed Plan.

2.     Approve the Disclosure Statement on a final basis.

3.     Direct the Debtor and creditors to carry out the terms of the Plan; and

4.     Approve the non-material modification concerning the LeGradys' claim.

DATED this 4th day of June, 2018.

THE FOX LAW CORPORATION, INC.

By:     /s/ Steven R. Fox
            Steven R. Fox, CSB #138808

THE LAW OFFICES OF KEITH Y. BOYD

By:     /s/ Keith Y. Boyd
            Keith Y. Boyd, OSB #760701

            Of Attorneys for Debtor in Possession

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page 2 of 25**

Case 17-33893-tmb11     Doc 169     Filed 06/04/18

# Table of Contents

I.   The Plan Satisfies §1129(a)'s Requirements ................................................ 3

A.   §1129(a)(1); The Plan Complies With the Applicable
     Provisions of Title 11 ................................................................... 3

B.   §1129(a)(2); The Proponent of the Plan Complies With
     the Applicable Provisions of Title 11 ........................................... 6

C.   §1129(a)(3); The Plan Has Been Proposed in Good Faith and
     Not By Any Means Forbidden By Law ........................................... 6

D.   §1129(a)(4);  All Payments Requiring Review By the Court Have
     Been or Will Be Subject to Approval as Reasonable .................... 7

E.   §1129(a)(5); The Proponents of the Plan Have Disclosed the
     Identities and Affiliations of Persons Participating in the Plan .... 7

F.   §1129(a)(6); Approval of Regulated Charges .............................. 7

G.   §1129(a)(7); Each Holder of a Claim or Interest of an Impaired
     Class Has Accepted the Plan or Will Receive Property of Value
     Not Less Than the Amount that Such Holder Would Receive or
     Retain if the Debtor's Assets Were Liquidated Under
     Chapter 7 of the Bankruptcy Code .............................................. 7

H.   §1129(a)(8); Acceptance by Classes of Impaired Claims ............ 8

I.   §1129(a)(9); The Plan Complies With the Required Treatment
     of Administrative and Priority Claims .......................................... 8

J.   §1129(a)(10);  Multiple Classes of Impaired Claims Have
     Accepted the Plan, Determined Without Including Any Acceptance
     of the Plan by an Insider ............................................................. 8

K.   §1129(a)(11); The Plan Is Feasible ............................................. 8

L.   §1129(a)(12); Requires the Payment of Filing Fees and Trustee's
     Fees Pursuant to Section 1930 of the Bankruptcy Code ............. 10

M.   §1129(a)(13) to (a)15 ................................................................ 10

N.   §1129(d): Avoidance of Taxes ................................................... 10

II.     The Requirements to Cramdown Any Objecting Class is
        Satisfied. §1129(b) ........................................................... 10
A.      Class 4's Treatment Satisfies §1129(b) ................................ 10
B.      The New Value Contribution is Substantial and Meets the
        Requirements the Ninth Circuit Has Specified ........................ 11
III.    Objections by Chen and Swift........................................... 13
A.      The Objection to Confirmation by Sue Chen ........................ 13
B.      Objection by Swift Financial ............................................ 14
IV.     The Temporary Injunction is Permitted and Should Issue........... 15
A.      Ninth Circuit Authority.................................................. 16
B.      Other Authority............................................................ 17
C.      Statutory Support for the Temporary Injunction ..................... 19
D.      The Test to Issue a Temporary Injunction Post-Confirmation ................... 21
E.      Terms of the Temporary Injunction...................................... 24
V.      Conclusion................................................................... 25

## Table of Authorities

U.S. Supreme Court

United States V. Energy Resources Co., Inc., 495 U.S. 545 (1990) ......................... 19
Katchen v. Landy, 382 U.S. 323, 327 (1966) .................................. 20
United States National Bank v. Chase National Bank, 331 U.S. 28 (1947) ...... 20
Pepper v. Litton, 308 U.S. 295 (1939) ........................................... 20
Wright v. Vinton Branch of the Mountain Trust Bank, 300 U.S. 440,
57 S.Ct. 556, 81 L.Ed. 736 (1937) ......................................... 18, 20

Circuit Court and Bankruptcy Appellate Panel Authority

Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel
Innovations, Inc.), 502 F.3d 1086, 1092 (9th Cir. 2007) ................................ 22

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page ii of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

<u>In re Sylmar Plaza</u>, 314 F.3d 1070 (9th Cir. 2002) .............................................. 6

<u>In re Ambanc La Mesa</u>,115 F.3d 650 (9th Cir. 1997) .................................. 11,12

<u>In re Lowenschuss</u>, 67 F.3d 1394 (9th Cir. 1995) ............................... 16, 17, 18

<u>Feld v. Zale Corp (In re Zale Corp.)</u>, 62 F.3d 746 (5th Cir. 1995) ........ 21, 22, 23

<u>Steelcase Inc. v. Johnston (In re Johnston)</u>, 21 F.3d 323 (9th Cir.1994) .............. 4

<u>In re Snyder</u>, 967 F.2d 1126, 1131 (7th Cir. 1992) ........................................ 12

<u>In re American Hardwoods</u>, 885 F.2d 621 (9th Cir. 1989) .......15, 16, 17, 18, 19

<u>Wells Fargo Bank, N.A. vs. Loop 76, LLC (In re Loop 76, LLC)</u>, 465 BR 525 (9th Cir. BAP 2012) ............................................................................................. 4, 14

<u>Computer Task Group vs. Brotby (In re Brotby)</u>, 303 B.R. 177 (9th Cir. BAP 2003) ...................................................................................... 9

<u>In re Rohnert Park Auto Parts, Inc.</u>, 113 B.R. 610 (9th Cir. BAP 1990) ... 16, 17, 19

<u>Bankruptcy Court Authority</u>

<u>In re Dan Haggerty's International Products</u>, Case no. 10-bk-11181-ER (Bankr. C.D. Cal. 2011) ............................................................................19

<u>In re Linda Vista Cinemas, LLC</u>, 442 B.R. 724 (Bankr. AZ 2010) (rev'd <u>Linda Vista Cinemas v. Bank of Arizona (In re Linda Vista Cinemas)</u> 2011 U.S. Dist. LEXIS 52885 (AZ 2011) .................................................. 19

<u>In re Regatta Bay, LLC.</u>, 406 B.R. 875 (Bankr. Ariz 2009) rev'd 2009 WL 5730501(D. Ariz. 2009) ............................................. 17, 18, 19

<u>In re Lyondell Chemical Co.</u>, 402 BR. 571 (S.D.N.Y. 2009) ............................. 24

<u>In re Seatco Inc.</u>, 257 B.R. 469, 476 (Bankr. N.D. Texas 2001) .................. 22, 24

<u>Matter of Treasure Bay</u>, 212 B.R. 520 (Bankr. S.D. Miss. 1997) ......................... 12

<u>In re United Marine, Inc.</u>, 197 B.R. 942 (Bankr. S.D. Fla 1996) ......................... 3

<u>In re Piece Goods Shops Co., L.P.</u>, 188 B.R. 778 (Bankr. M.D.N.C. 1995) .......... 3

<u>In re Elmwood, Inc.</u>, 182 B.R. 845 (D. Nev. 1995) ......................................... 12

<u>In re 500 Fifth Ave. Assocs.</u>, 148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ............. 4, 14

<u>In re U.S. Truck Co.</u>, 47 B.R. 932 (Bankr. E.D. Mich. 1985) ............................... 4

<u>In re Nite Lite Inns</u>, 17 Bankr. 367 (Bankr. S.D. Cal. 1982) ................................. 6

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page iii of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAN CONFIRMATION

Section 1129(a) provides that the Court shall confirm a plan only if specific requirements are met.

## I.

## The Plan Satisfies §1129(a)'s Requirements.

**A.      §1129(a)(1); The Plan Complies With the Applicable Provisions of Title 11.**

The substantive provisions of the Bankruptcy Code which are most relevant in the context of §1129(a)(1) are found in §§1122, 1123, and 1125.

**1.      The Requirements of §1122(a) and (b) Are Satisfied.**

The Plan's classification of secured and unsecured claims is reasonable.

- Administrative claims are classified separately from classified claims.

- Class 1 consists of the sole secured claim and is separately classified.

- Class 2 consists of deminimus unsecured claims of $500 or less. This classification is permissible.  §1122(b); <u>In re United Marine, Inc.</u>, 197 B.R. 942, 945 (Bankr. S.D. Fla 1996); <u>In re Piece Goods Shops Co., L.P.</u>, 188 B.R. 778, 788-89 (Bankr. M.D.N.C. 1995)

- Class 3 consists of general unsecured claims.

- Class 4 contains general unsecured claims also holding claims against third parties including the Debtor's principals.  Separate classification is reasonable because this type of claim is dissimilar to that of a vendor, an unsecured lender or other unsecured creditor who does not hold claims against third parties such as the Debtor's officers and principals.

Separate classification is reasonable because the claims in this

class are dissimilar to those in Class 3.  Steelcase Inc. v. Johnston (In re Johnston), 21 F.3d 323, 327 (9th Cir.1994); Wells Fargo Bank, N.A. vs. Loop 76, LLC (In re Loop 76, LLC), 465 BR 525 (9th Cir. BAP 2012)(court may consider a guaranty as  a factor to determine if claims are substantially similar); In re 500 Fifth Ave. Assocs., 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (considerable discretion to classify claims)

The separate classification of Class 4 claims was not proposed in order to manipulate the voting.  Class members have either obtained a judgment (Knight Capital) or an arbitrator's award (Swift Financial) or have the right to file suit (LoanMe) against the principals, the Burtons.  Unlike class 3, these claimants could lien assets of the Burtons.

• Class 5 consists solely of equity.  They retain their interest in exchange for their new value contribution.

The Plan treats unsecured administrative claims as unclassified claims to be paid in full on the Effective Date or paid following allowance of such claims.

The classification of claims is proposed in good faith.  Debtor did not divide the claims into multiple classes to solely create a consenting class to permit confirmation.  E.g., In re U.S. Truck Co., 47 B.R. 932, 939 (Bankr. E.D. Mich. 1985).

### 2. The Requirements of Section 1123 Have Been Satisfied.

• (a)(1).  The Plan classifies claims other than administrative priority claims and priority tax claims.   Administrative claims and priority tax claims are not classified while all other claims are classified.

• (a)(2).  The Plan identifies any class of unimpaired claims or interests.

• (a)(3).  The Plan specifies the treatment of any class of claims or interests impaired under the Plan.  Classes 1 to 4 are impaired.

- (a)(4). The Plan treats each claim or interest in a particular class the same.

- (a)(5). The Plan provides adequate means for its implementation.

  - The Debtor shall retain all estate property. §1123(a)(5)(A).

  - Liens are being modified.

  - Defaults are being waived. §1123(a)(5)(G)

  - Funding Circle's note's maturity date is being modified. §1123(a)(5)(H)

  - New securities of the Debtor will be issued following plan confirmation. §1123(a)(5)(J)

- (a)(6). The Plan provides for the inclusion in the Debtor's charter of a provision prohibiting the issuance of nonvoting equity securities. §1123(a)(6).

- (a)(7). The Plan contains provisions which are consistent with creditors' interest and the public interest as to the manner of selecting new officers or directors.

- (a)(8). This provision applies only to individual debtors.

## 3.  The Requirements of Section 1125 Have Been Satisfied

Section 1125(a) and (b) specify when an acceptance or a rejection may be solicited and requires that a Disclosure Statement contain adequate information.

The Debtor filed its Disclosure Statement (docket no. 151), the Court entered an "Order Conditionally Approving Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan" (docket no. 157)

The Debtor did not solicit the acceptances or rejections before  authorized to do so.  Appropriate materials were distributed to all parties in interest at that time.

The Certificate of Service filed on May 14, 2018 (docket no 159) reflects service

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification **Page 5 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

of the Disclosure Statement Order. The "Notice of Hearing on Confirmation of Proposed Plan; Notice of Last Day to Cast Ballot and to Object to Plan Confirmation" (docket no. 160) avers that the correct materials were sent to parties as required by the terms of the Disclosure Statement Order.

## B. §1129(a)(2); The Proponent of the Plan Complies With the Applicable Provisions of Title 11.

The relevant consideration here is whether the Debtor complied with §1125 requiring full disclosure prior to solicitation of acceptances. This is discussed above.

## C. §1129(a)(3); The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden By Law.

A plan is proposed with the necessary good faith where the plan achieves a result which is consistent with the Bankruptcy Code's objectives and purposes. In re Sylmar Plaza, 314 F.3d 1070, 1074-75 (9th Cir. 2002).

One case explained the good faith requirement as follows:

Essentially, a reorganization plan is proposed in good faith when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.... The primary purpose of the reorganization chapters of both the Act and the Code has been to promote restructuring of debt and the preservation of economic units rather than a dismantling of the estate."

In re Nite Lite Inns, 17 Bankr. 367, 370 (Bankr. S.D. Cal. 1982).

No objecting creditor has suggested the Plan was not proposed in good faith.

Good faith is demonstrated by the following:

• Unsecured creditors are being paid a significant dividend.

• Classes 1, 2 and 3 voted to accept the Plan.

- Class 4 contains three members.  Two voted to accept, satisfying the ½ voting requirement.  The 2/3 requirement was close to being satisfied.

- One member of Class 4, Knight Capital, provided a declaration supporting plan confirmation.  **Exhibit "H"**

- The Plan preserves the property of the estate as one economic unit and does not propose a liquidation.

**D.     §1129(a)(4);  All Payments Requiring Review By the Court Have Been or Will Be Subject to Approval as Reasonable.**

All payments in this case requiring approval by this Court are and will be subject to approval by this Court through the filing of professionals' fee applications.

**E.     §1129(a)(5); The Proponents of the Plan Have Disclosed the Identities and Affiliations of Persons Participating in the Plan.**

The Disclosure Statement provides this disclosure.

**F.     §1129(a)(6); Approval of Regulated Charges.**

Section 1129(a)(6) is inapplicable to this Debtor.

**G.     §1129(a)(7); Each Holder of a Claim or Interest of an Impaired Class Has Accepted the Plan or Will Receive Property of Value Not Less Than the Amount that Such Holder Would Receive or Retain if the Debtor's Assets Were Liquidated Under Chapter 7 of the Bankruptcy Code.**

Creditors must accept the Plan or receive or retain under the Plan property of a value, as of the Plan's effective date not less than the amount that such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of the title.

Going to the first element, acceptance of the Plan:

- Classes 1 - 3 accepted the Plan thus satisfying §1129(a)(7)(A)(I).

- Class 4 voted to reject the Plan but the Debtor satisfies §1129(a)(7)(A)(ii) because in the event of liquidation, members of Class 4 would receive

no distribution.  (Exhibit "B" to the Disclosure Statement)

No creditor objected to Plan confirmation arguing §1129(a)(7)(A)(ii) was not satisfied.  Swift notes the value of assets in Schedule B but that Schedule included work in progress which would have no value unless completed.

## H.  §1129(a)(8); Acceptance by Classes of Impaired Claims.

Each impaired class must vote to accept the plan or each class is not impaired under the plan.  If §1129(a)(8) is not satisfied, then the proponent may resort to §1129(b).  Classes 1 to 4 are impaired.  Classes 1 to 3 voted to accept.  Class 4 voted to reject.  This provision is not satisfied.

Also, Class 4 member LoanMe cast two ballots, the first accepting, the second, and later in time ballot, rejecting. LoanMe did not file a motion seeking to change its vote from accepting to rejecting and it offered no reason for the later rejecting ballot.

## I.  §1129(a)(9); The Plan Complies With the Required Treatment of Administrative and Priority Claims.

Any tax claims will be paid in full within five years of the date of filing of the bankruptcy petition.  Professionals will be paid following the approval of applications for compensation and, with the agreement of such professionals, over time.

## J.  §1129(a)(10);  Multiple Classes of Impaired Claims Have Accepted the Plan, Determined Without Including Any Acceptance of the Plan by an Insider.

 Impaired classes 1 to 3 voted to accept the plan.  Class 4 did not.

## K.  §1129(a)(11); The Plan Is Feasible.

Section 1129(a)(11) requires the Court to find that:

In addressing feasibility, the 9th Circuit Bankruptcy Appellate Panel stated:

To demonstrate that a plan is feasible, a debtor need only show a reasonable probability of success.  Acequia, 787 F.2d at 1364.   The Code does not require the debtor to prove that success is inevitable, In re WCI Cable, Inc.,

282 B.R. 457, 486 (Bankr.D.Or.2002), and a relatively low threshold of proof will satisfy § 1129(a)(11), In re Sagewood Manor Assocs. Ltd., 223 B.R. 756, 762 (Bankr.D.Nev.1998), so long as adequate evidence supports a finding of feasibility. See In re Pizza of Hawaii, Inc., 761 F.2d at 1382 (reversing where feasibility determination excluded consideration of major claim).

<u>Computer Task Group vs. Brotby (In re Brotby)</u>, 303 B.R. 177, 191-192 (9th Cir. BAP 2003).

All a debtor needs to show is a reasonable probability of success, not a guaranty. During the chapter 11 case, the Debtor has moved away from the considerable prepetition accrued losses, to smaller accrued losses earlier in the chapter 11 case and then to positive net income later in the chapter 11 case.

No objector creditor argues the Plan is infeasible.

Attached as exhibits here are copies of the following reports:

| | |
|---|---|
| **Exhibit "I"**: An accrual based P&L Statement. | **Exhibit "N"**: A work in progress report. |
| **Exhibit "J"**: A cash based P&L Statement. | **Exhibit "O"**: A bid log. |
| **Exhibit "K"**: A payables report. | **Exhibit "P"**: Actual to budget report. |
| **Exhibit "L"**: A receivables report. | **Exhibit "Q"** Closing Statement on duplex unit and wire instructions from Andrew Burton to Boyd Law Offices |
| **Exhibit "M"**: A balance sheet. | |

The exhibits reflect (1) continued work at appropriate margins, (2) continued bidding for new work, (3) the Debtor incurring losses early in the case but since then showing consistent progress and positive net cash flow and (4) the new value contribution of $65,000 in Mr. Boyd's account. The actual to budget report reflects that though the Debtor did not enjoy the projected gross revenues, the Debtor cuts its

COGS and expenses sufficiently that the Debtor's net income closely matched the projected net income.

The Plan, if confirmed, is not likely to be followed by a liquidation or a need for further financial reorganization.

## L.  §1129(a)(12); Requires the Payment of Filing Fees and Trustee's Fees Pursuant to Section 1930 of the Bankruptcy Code.

The Debtor is current in payments to the United States Trustee and will have paid any then outstanding fees as of the Effective Date.

## M.  §1129(a)(13) to (a)(15)

These provisions are inapplicable to the Debtor as it does not offer retirement benefits, it has no domestic support obligations, it is not an individual debtor.

## N.  § 1129(d): Avoidance of Taxes.

No governmental entity has requested that the Plan not be confirmed or has suggested any avoidance.

## II.

## The Requirements to Cramdown Any Objecting

## Class Are Satisfied.  §1129(b)

## A.  Class 4's Treatment Satisfies §1129(b).

Section 1129(b)(2) allows confirmation, despite rejection of a plan by one or more classes, if the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the impaired class of claims rejecting the plan.  §1129(B)

### 1.  Class 4 (General Unsecured Creditors Holding Guaranty Claims).

Class 4's treatment satisfies the standard.

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification        **Page 10 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

- In liquidation, unsecured creditors would receive nothing.

- The Plan proposes to pay a 20% distribution over time.

- Each member of this class, following the time of the temporary injunction, will have an opportunity to exercise its state law remedies. Each member's guaranty includes the payment of principal, interest and attorneys' fees so the only prejudice to the member will be the delay in time. The members of this class have likely declared defaults under the guaranties so any transfers of assets by the Burtons could be considered a fraudulent conveyance as to the class members.

**B.**  **The New Value Contribution is Substantial and Meets the Requirements the Ninth Circuit Has Specified.**

The Burtons propose to infuse $65,000 to retain their interest.

The monies will pay administrative expenses. Without the new value contribution the Debtor would be unable to meet its obligations, pay administrative claims <u>and</u> pay other Plan obligations.

The new value corollary has a five part test. The monies must be (1) new, (2) substantial, (3) in money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received. <u>In re Ambanc La Mesa</u>,115 F.3d 650 (9th Cir. 1997) at 654.

As to the first element, the monies are new.

As to the second element, the contribution must be a present contribution and must be freely tradable. <u>In re Ambanc La Mesa</u> at 655 (internal citation omitted) The $65,000 is held in Mr. Boyd's account and is available for immediate distribution.

The contribution should be more than a "gratuitous, token cash infusion

Plan Confirmation Memorandum For Confirmation Hearing And Request That The Court Approve Non-Material Modification **Page 11 of 25**

Case 17-33893-tmb11   Doc 169   Filed 06/04/18

proposed primarily to buy cheap financing." In re Snyder, 967 F.2d 1126, 1131 (7th Cir. 1992). The Ambanc court looked at substantiality comparing the contribution to: (1) the total unsecured claims; (2) the claims being discharged; or (3) the dividend to be paid on unsecured claims due to the contribution. Ambanc at 655.

- Reconciled claims in Class 3 amount to $1,029,797;

- Reconciled claims in Class 4 amount to $288,791;

- Total of Class 3 and 4: $1,318,588. (Disclosure Statement, Exhibit "E")

- The new value contribution is just under 5% of total unsecured claims.

Substantial claims are being discharged but the contribution permits a significant distribution to these classes.

In Ambanc, a $32,000 contribution was not substantial as it was less than 0.5% of $4 million total of general unsecured debt. Id. 655. In In re Elmwood, Inc., 182 B.R. 845 (D. Nev. 1995), a contribution of less than 4% was substantial.

As to the third element, the new value is in the form of monies.

As to the fourth element, the contribution helps to ensure feasibility by paying administrative claims and professionals. This makes it more likely the general unsecured creditors will be paid.

As to the fifth element, this requirement seeks to prevent an insider from obtaining a debtor through self dealing and ensuring the new value is fair and equitable to the creditors. Matter of Treasure Bay, 212 B.R. 520, 545 (Bankr. S.D. Miss. 1997) This Debtor is a small closely held corporation whose future depends on Mr. Burton's efforts. There is no market for the equity in this kind of a debtor. The Debtor's value relies on Mr. Burton being able to work hard for five years.

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page 12 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

Here the value of the assets on hand at liquidation is $72,753 (Disclosure Statement at Exhibit "B"). The new value contribution, $65,000 is roughly equivalent to the value of the Debtor's assets at liquidation.

**Exclusivity Period.** The exclusivity period expired on or about April 16, 2018. §1121(c). This provision does not grant 60 more days exclusivity to confirm a plan.

III.

**Objections by Chen and Swift.**

A. <u>The Objection to Confirmation by Sue Chen</u>.

Sue Chen engaged the Debtor to build a custom home. She let her insurance lapse. A fire occurred causing major damage. The Debtor cut its prices and did its best to assist her. These steps cost the Debtor dearly and her fire was one of the precipitating causes of this chapter 11 case.

Chen did not cast a ballot.

Her objections are twofold.

1. <u>Absolute Priority Rule</u>.

First, she states that equity retains its interest while superior claims are unpaid in full. However, the Burtons are contributing new value, $65,000. The contribution meets the five part test the Ninth Circuit has enunciated for determining if the contribution qualifies as new value.

2. <u>Treatment of Classes 3 and 4</u>.

Chen states that the differing treatment, 10% of Class 3 claims and 20% of Class 4 claims, unfairly discriminates between substantially similar creditors.

However, the members of these two classes are not substantially similar. Instead, they are substantially dissimilar. The facts explaining the dissimilar nature of

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification **Page 13 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

the claimants in these two classes is discussed above. Class 4 claimants hold guaranties. One took a judgment; one obtained an arbitrator's award. Class 3 members have none of these legal rights. The classification was not meant to manipulate the voting. <u>Wells Fargo Bank, N.A. vs. Loop 76, LLC (In re Loop 76, LLC)</u>, 465 BR 525 (9th Cir. BAP 2012)(court may consider a guaranty as a factor to determine if claims are substantially similar); <u>In re 500 Fifth Ave. Assocs.</u>, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("proponent ... has considerable discretion to classify claims and interests according to the facts and circumstances of the case")

Those Class 3 creditors voting, voted almost unanimously to accept the different treatment. Also, based on the liquidation analysis the payment Class 3 members would be paid is substantial compared to a 0% distribution in chapter 7 case.

**B.** **<u>Objection by Swift Financial</u>.**

Swift's two objections concern the temporary injunction and Swift's assertion that its claim is secured and that it should not be required to release its lien.

1. **<u>The Temporary Injunction</u>.**

This objection is discussed in Section IV below.

2. **<u>Swift's Claim is Unsecured</u>.**

Swift asserts its claim is a secured claim. It states that its loan documents provide that the Debtor granted Swift a security interest.

Swift ignores the valuation process. §506(a).

The value of the Debtor's assets at liquidation would be insufficient for Swift's security interest to attach. (Liquidation analysis value $72,753 (Disclosure Statement, Exhibit "B") - amount of senior lender's claim $77,706.57.)

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification                **Page 14 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

On a going concern basis, the Debtor's value is what a purchaser with knowledge of the facts would pay for the Debtor. The relevant facts are the following:

- Mr. Burton founded the Debtor, brings in the work, oversees marketing and prepares job estimates with help from others.

- The Debtor will pay all projected disposable income into its Plan.

- The Debtor's hard assets have relatively little value other than monies ($15,822), receivables ($22,746) and one vehicle ($25,500).

4. The one considerable asset listed in the Debtor's Schedule B is the value in work in progress - if completed. Work in progress has value only if the work is done. All of the net income is projected to go to creditors.

It is an easy conclusion that a purchaser would at most pay the liquidation value of the assets. No reasonable purchaser will purchase a business which is projected to generate no net income (for the purchaser) for a period of 5 years.

Plan provision 5.06 provides that Swift shall release its financing statement following the Effective Date. Provided that the Court finds that Swift's interest does not attach to any interest of the Debtor, then this relief, release of the security interest, is appropriate and permitted under the Code and the Rules.

## IV.

## The Temporary Injunction is Permitted and Should Issue.

Funding Circle, Knight and LoanMe, voted to accept the Plan and willingly agreed to the issuance of the temporary injunction. Swift voted to reject the Plan and objects to the temporary injunction.

Bankruptcy courts have the authority under §§1123(b), 1141, 524(e) and 105 to issue the temporary injunction sought here.

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page 15 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

## A. Ninth Circuit Authority.

Two Ninth Circuit cases, In re American Hardwoods, 885 F.2d 621 (9th Cir. 1989) and In re Lowenschuss, 67 F.3d 1394 (9th Cir. 1995), do not prohibit this Court from issuing a temporary injunction.

In American Hardwoods, the debtor sought a permanent injunction restraining a creditor from pursuing the guarantor.  The Ninth Circuit phrased the issue before it narrowly and precisely: "This appeal presents a narrow issue of first impression in our circuit: does the bankruptcy court have jurisdiction and power to enjoin permanently, beyond confirmation of a reorganization plan, a creditor from enforcing a state court judgment against nondebtors " (Id. at 623; emphasis added) The Ninth Circuit, relying on §524(e), held the bankruptcy court could not discharge the liabilities of a non-debtor.  Id. at 625-626)  American Hardwood did not address a post-confirmation temporary injunction.

Lowenschuss, is inapplicable because there the debtor sought discharges for non-debtors.  No such request is made here.

In re Rohnert Park Auto Parts, Inc., 113 B.R. 610 (9th Cir. BAP 1990) is also distinguishable because of some unique facts.  There (unlike here) a creditor holding a very large claim did not file a proof of claim and would receive no distribution under the plan.  Given this, the Panel concluded "...it would be inequitable to hold that a creditor whose claim is held time barred, and who is unable to benefit from the Plan, to be bound by a provision of the Plan enjoining pursuit of a claim against guarantors of the debtor." Rohnert at 616. The Panel acted equitably based on the unique and sad facts before it.  Here Swift filed a timely claim and will be receiving monies through the Plan.  Here creditors will be

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification                    **Page 16 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

paid a dividend, more than they could receive in a liquidation.  Also, Mr. Burton is offering new value.  <u>Rohnert</u> is factually different and not binding on this Court.

Unlike <u>Rohnert</u>, where the plan apparently enjoined collection of any debts without any other limits on the length of the injunction, here creditors can move to terminate the injunction.  (Disclosure Statement, §10.03.8, pg. 22)

## B. <u>Other Authority</u>.

There is other authority in the Ninth Circuit approving an injunction such as the one proposed here.  Whether a temporary injunction can be issued was addressed by Judge Haines in <u>In re Regatta Bay, LLC.</u>, 406 B.R. 875 (Bankr. Ariz 2009) rev'd 2009 WL 5730501(D. Ariz. 2009).  In <u>Regatta</u>, a creditor obtained a judgment for $6 million against the debtor and its principals.  The debtor filed a chapter 11 petition and confirmed a plan providing for full payment to its creditors.  (<u>Id</u>. at 877) The plan provided a senior mortgage against the debtor's property would be paid in full within 1 and ½ years following plan confirmation. The judgment creditor's judgment would then be satisfied in full with interest at the statutory rate in the next 2 and ½ years.  Then other creditors would be paid.  The co-debtors agreed to contribute new value.  The plan provided the judgment creditor was enjoined from attempting to satisfy its judgment from the principals or their property until the earlier of (1) the payment of all plan payments, (2) the case was converted or dismissed or (3) there was a default under the plan.

In the context of considering a motion for stay pending appeal, the court noted Ninth Circuit authority does not prohibit a temporary injunction which delays a creditor's efforts to satisfy a claim from a co-debtor.  (<u>Id</u>. at 878)  The bankruptcy

court distinguished <u>American Hardwoods</u>, <u>Lowenschuss</u> and <u>Rohnert</u>.  The lower court found authority to issue the post-confirmation injunction in §1141(a).

The <u>Regatta Bay</u> court looked to U.S. Supreme Court precedent holding that a deferment of a right to collect a creditor may have is not the same as denying a collection right.  The bankruptcy court stated:

> The plan term at issue here merely delays the creditor's enforcement of its rights against Wright and Keesling until the earlier of full consummation of the plan (including full payment of the creditor, with interest) or a default under the plan or dismissal or conversion of the case. For the creditor's argument based on <u>American Hardwoods</u> and <u>Lowenschuss</u> to have any merit, the essential (but unstated) step in the creditor's argument is to equate that temporary delay in enforcement to either a discharge or a release, i.e., to a complete denial of the creditor's rights against Wright and Keesling. But it has long been fundamental, not only to bankruptcy law but also to constitutional law and even the structure of our judiciary, that a mere delay in the enforceability of creditors' remedies is not equivalent to a denial or a "taking" of their rights.

<u>Regatta</u> at 879- 880 citing <u>Wright v. Vinton Branch of the Mountain Trust Bank</u>, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937)(reversing prior holding that a five year stay of a lien holder's right to foreclose on real property was an unconstitutional taking and ruling that a 3 year delay was not).  Given the Supreme Court's ruling reversing its prior ruling that a five year stay was an unconstitutional taking, it is no leap to conclude that the temporary injunction's five year term is constitutionally permissible.

On appeal, the Arizona district court reversed the lower court, finding the lower court's power to issue the injunction was based on §105 and was trumped

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification                **Page 18 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

by §524(e).  The district court did not engage in the reasoned analysis the bankruptcy court undertook.  The district court applied an incorrect analysis of American Hardwoods, Rohnert and other cases to conclude Judge Haines' reasoning was flawed.  The district court did not consider the significant factual differences between Rohnert and Regatta (e.g., the new value contribution and full payment to the judgment creditor, dissolution of the injunction in the event of a default, and the scope of which creditors would be restrained in Regatta) nor did the district court consider the takings issue Judge Haines discussed.

Other case authority includes In re Dan Haggerty's International Products, Case no. 10-bk-11181-ER, (Bankr. C.D. Cal. 2011).  A copy of the court's unpublished memorandum is attached here as **Exhibit "R."**

See In re Linda Vista Cinemas, LLC, 442 B.R. 724 (Bankr. AZ 2010) (rev'd Linda Vista Cinemas v. Bank of Arizona (In re Linda Vista Cinemas), 2011 U.S. Dist. LEXIS 52885 (AZ 2011)

C.     Statutory Support for the Temporary Injunction.

Authority for the temporary injunction is found in §§105 and 1123(b)(6). The High court, in United States V. Energy Resources Co., Inc., 495 U.S. 545 (1990) offered some guidance construing §105(a) and §1123(b)(6) (then §1123(b)(5)).  The  plan provided that the Internal Revenue Service would be required to apply payments made to it under the plan first to trust fund obligations. The I.R.S. contended the debtor could not direct how payments were to be treated. In response, the High Court spoke to the broad equitable authority bankruptcy courts have to fashion plans not inconsistent with the Bankruptcy Code under

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page 19 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

§1123(b).

The Code does not explicitly authorize the bankruptcy courts to approve plans designating tax payments as either trust fund or non-trust fund. The Code, however, grants the bankruptcy courts residual authority to approve reorganization plans including "any ... appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(5). The Code also contains §105(a). These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships. See Pepper v. Litton, 308 U.S. 295, 303-304 (1939); United States National Bank v. Chase National Bank, 331 U.S. 28, 36, (1947); Katchen v. Landy, 382 U.S. 323, 327 (1966).

A bankruptcy court's order confirming a plan must have meaning.  If a creditor can go after a third party guarantor, take the guarantor's assets and put the company out of business (because the principal has to focus on protecting his or her family and future), then the court's order has no meaning.

At the same time, the temporary injunction recognizes the right of creditors to collect from a third party (such as the principal) but only after the rights of all creditors under the plan have been satisfied.  A collection action against a guarantor is, at a minimum, related to the chapter 11 case giving the bankruptcy court jurisdiction to issue the temporary injunction.  This balance does not offend the constitution (Wright vs. Vinton Branch), does not offend §524(e) (no release for a third party) but upholds the bankruptcy court's authority and orders and also protects the interests of other creditors not holding claims against third parties.

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page 20 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

Section 524(e)'s bar is not offended by the temporary injunction.  It merely provides that a discharge of a debtor does not affect the liability of any other entity for such debt.  It does not state a bankruptcy court cannot delay a creditor from pursuing a third party on a liability.  Given prior U.S. Supreme Court rulings, §524(e) cannot.

Section 1141 discharges a debtor from prepetition claims.  A creditor seeking to enforce payment of discharged claims against a principal effectively runs around §1141 and frustrates the order confirming the plan.

Words matter. The language in §524(e) is permissive.

The language in §524(e) ("does not") is permissive using the word "does" instead of "shall" or "will".  In contrast, §1129's language is mandatory. Section 524(e) does not expressly limit the ability of a bankruptcy court to delay enforcement of a claim against a third party; it says the liability of a third party cannot be discharged by a debtor's discharge.  See Airadigm Communications vs. FCC (In re Airadigm Communications), 519 F.3rd 640 (7th Cir. 2008).

D.    <u>The Test to Issue a Temporary Injunction Post-Confirmation</u>.

The Debtor is unaware of binding authority in the Ninth Circuit enunciating a standard under which a temporary injunction may be issued.  In <u>Feld v. Zale Corp (In re Zale Corp.)</u>, 62 F.3d 746 (5th Cir. 1995), the Fifth Circuit enunciated a two part test to determine if permitting a temporary injunction post-confirmation was permissible to assist the reorganization but in a manner not to effectively constitute a permanent injunction.  The circumstances are either (1) an identity of interest between the debtor and the third party that is so close that the collection

Plan Confirmation Memorandum For Confirmation Hearing And Request That The Court Approve Non-Material Modification          **Page 21 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

action effectively is a suit against the debtor and (2) when the collection action will adversely impact the debtor's ability to perform under its plan and reorganize. The Zale court noted that an injunction may be issued if either of these two circumstances are present. Zale at 761. Facts relevant to each of these circumstances is discussed below.

If the test is met, then the bankruptcy court considers the traditional four part test for issuance of an injunction. In re Seatco Inc., 257 B.R. 469, 476 (Bankr. N.D. Texas 2001); Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086, 1092 (9th Cir. 2007), cert. denied, 553 U.S. 1017 (2008) The Seatco court stated the four part test as follows:

> The four prerequisites to the issuance of such an injunction are: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause to the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest.

Id. at 477.

Facts exist here which permit this Court to issue a temporary injunction.

The Burtons are the Debtor's principals. They are a young couple with young children. Their assets include (1) the stock in the Debtor, (2) raw land with equity of $70,000, (3) one half of a duplex with perhaps $150,000 in equity before the homestead exemption. These assets will appreciate and become more

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification                    **Page 22 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

valuable. They lack retirement savings and other substantial assets. The income from the Debtor is barely sufficient to pay their bills and they lack the money to defend against Swift and other creditors. Their financial future is tied to the Debtor's success. Their income is consumed by their monthly bills and expenses.

Mr. Burton's roles with the Debtor are essential. He oversees all administrative functions, is the face of the company to the world, handles all sales, marketing and does the estimating. A creditor could take a judgment, against them and foreclose on their stock in the Debtor. The creditor could also garnish their wages leaving them less incentive to work. Foreclosing on their two remaining properties would prompt them to leave the Debtor as they would need to find new housing and they would need to put their family first. They would be better off being employees with limits on garnishments.

No one at the Debtor has Mr. Burton's abilities to manage the business operation. Mr. Burton is essential to the successful implementation of the Debtor's proposed Plan.

Swift and Knight have aggressively pursued their interests in the chapter 11 case and in the state court actions.

The two circumstances the Fifth Circuit enunciated in <u>Zale</u> are demonstrated here. It is appropriate to issue a temporary injunction but subject to the Debtor meeting the traditional 4 part test.

<u>The Traditional Four Part Test is Also Met</u>.

Here success on the merits refers to the likelihood the plan will be confirmed. The Plan is confirmable.

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page 23 of 25**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

- With the exception of Swift and one other creditor holding a smaller claim, all creditors voted to accept the Plan.

- The Debtor is cash flow positive.

- The projections of future income and expenses are based on the Debtor's post-petition performance and are likely to be met.

- At liquidation, the unsecured creditors would receive nothing.

The first element, likelihood of success on the merits, is met.

As to the second element, if the temporary injunction is not issued and a creditor holding a claim against the Debtor and the Burtons pursues its rights against the Burtons, then there would be a substantial threat to the Debtor's ability to make plan payments and to reorganize. This element is satisfied.

As to the third element, while a creditor may assert that it is entitled to pursue guarantors during the plan term, when that entitlement is measured against the harm to the Debtor and the creditor body, the one creditor's individual harm - delay in enforcing rights - pales before the creditor body's entitlement to plan payments. In re Lyondell Chemical Co., 402 BR. 571 (S.D.N.Y. 2009) There would be substantial harm to all creditors for the benefit of one creditor. The plan provides a mechanism for the temporary injunction to be removed in the event of a default. The third element is satisfied.

Finally, issuing the injunction does not dis-serve the public interest which favors reorganization. In re Seatco, at 478.

E.     **Terms of the Temporary Injunction.**

The Court may deem it appropriate to modify the injunction's terms.

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page 24 of 25**

Case 17-33893-tmb11   Doc 169   Filed 06/04/18

# V.

## Conclusion.

**WHEREFORE** the Proponent requests that the Court:

1.　　Find that the Plan satisfies §1129 and other applicable sections of the U.S. Bankruptcy Code and confirm the Debtor's proposed Plan.

2.　　Approve the Disclosure Statement on a final basis.

3.　　Direct the Debtor and creditors to carry out the terms of the Plan; and

4.　　Approve the non-material modification concerning the LeGradys' claim.

DATED this 4th day of June, 2018.

THE FOX LAW CORPORATION, INC.


By:　　 /s/ Steven R. Fox

Steven R. Fox, CSB #138808


THE LAW OFFICES OF KEITH Y. BOYD


By:　/s/ Keith Y. Boyd

Keith Y. Boyd, OSB #760701

Of Attorneys for Debtor in Possession

Plan Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification　　　　**Page 25 of 25**

Case 17-33893-tmb11　　Doc 169　　Filed 06/04/18

Exhibit "H" Page 1 of 3

# Exhibit "H"

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

In re:                                                    Case No. 17-33893-tmb-11

CREEKSIDE HOMES, INC.

        Debtor.

## DECLARATION OF CREDITOR'S ACCEPTANCE
## AND SUPPORT OF PLAN OF REORGANIZATION

STATE OF FLORIDA      )
                       )
COUNTY OF MIAMI DADE  )

       Amanda L. Barton, Esq., being first duly sworn deposes and states as follows:

       1.     I am the in-house attorney of Knight Capital Funding III, LLC with the authority to make the representations contained herein.

       2.     Knight Capital Funding III, LLC hereby supports the Debtor's Plan of Reorganization dated April 16, 2018, as filed with this honorable court at docket entry no. 150.

       Dated this 31st day of May, 2018.

*[Signature Page to Follow.]*

Exhibit "H" Page 2 of 3

_____

AMANDA L. BARTON, ESQ.

I HEREBY CERTIFY that on 31st day of May, 2018 before me, a Notary Public duly authorized in the State and County aforesaid, personally appeared Amanda L. Barton, Esq. of Knight Capital Funding III, LLC, and who executed the foregoing instrument, and acknowledged before me that he/she executed it in the name of and for that company, and that he/she was duly authorized by that company to do so, and that he/she is personally known to me.

_____

NOTARY PUBLIC

Name: Liliana Rivero

Certificate No: GG 207997

My Commission expires: 8/14/22



Exhibit "I" Page 1 of 3

# Exhibit "I"

| Creekside Accrual P & L | Oct 19 - 31, 17 | Nov 17 | Dec 17 | Jan 18 | Feb 18 |
|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | |
| **Income** | | | | | |
| Buildertrend Invoice | | 82,875.97 | 58,753.68 | 44,730.00 | 89,565.00 |
| 420.00 · Construction | 3,640.00 | 20,877.05 | 29,961.72 | 40,495.00 | 78,975.00 |
| 430.00 · Reimbursed Expenses | 1,536.47 | | | | |
| 440.00 · Discounts | | | | | |
| Total Income | 5,176.47 | 103,753.02 | 88,715.40 | 85,225.00 | 168,540.00 |
| Cost of Goods Sold | | | | | |
| 830.00 · Sanitation | | 180.04 | 100.00 | 20.00 | 115.00 |
| 500.25 · Licenses, Bonds & Permits | | | 550.00 | 335.00 | |
| 500.85 · Subcontractors | | | | | |
| 500.00 · Cost of Goods Sold | 21,946.02 | 24,430.18 | 70,261.98 | 96,324.88 | 55,614.81 |
| 500.05 · Job materials | | 6,307.74 | 780.99 | 4,471.85 | 8,596.55 |
| 500.10 · Building supplies | | 2,108.79 | 3,635.64 | 109.45 | |
| 500.15 · Engineering | | | | | 1,220.00 |
| 500.20 · Labor | | 18,610.51 | 8,688.10 | 10,145.13 | 7,818.24 |
| 500.45 · Tools and Machinery | | | | | 268.74 |
| Total COGS | 21,946.02 | 51,637.26 | 84,016.71 | 111,406.31 | 73,633.34 |
| Gross Profit | (16,769.55) | 52,115.76 | 4,698.69 | (26,181.31) | 94,906.66 |
| **Expense** | | | | | |
| 555.00 · Bookkeeping | 500.00 | 1,000.00 | 1,000.00 | 1,500.00 | 500.00 |
| 776.00 · Payroll Processing Fees | | 85.01 | 170.02 | 171.60 | |
| 725.00 · Licenses and Fees | | | 420.00 | 300.00 | |
| 520.00 · Advertising | | 309.00 | 2,608.41 | 5,602.16 | 977.16 |
| 535.00 · Automobile and truck expense | | 3,342.05 | 1,888.85 | 1,464.51 | 2,498.23 |
| 550.00 · Bank charges | 6.00 | 599.58 | 35.43 | 267.41 | 924.88 |
| 595.00 · Cleaning | | | 125.00 | 225.00 | |
| 599.00 · Crew lunches | | 2,121.29 | 53.89 | 500.14 | 46.03 |
| 610.00 · Dues and subscriptions | | 4,071.88 | | | |
| 680.00 · Fuel | | 1,295.65 | 1,694.91 | 796.59 | 814.42 |
| 695.00 · Insurance | | 2,226.50 | 1,232.56 | 1,665.73 | 3,062.03 |
| 720.00 · Legal and professional | | | | 1,625.00 | |
| 750.00 · Office expense | 371.23 | | 1,251.57 | 1,325.91 | 869.65 |
| 810.00 · Rent | | 1,320.00 | 1,120.00 | 1,120.00 | 1,240.00 |
| 855.00 · Telephone | | 534.64 | 827.31 | | 390.51 |
| 880.00 · Utilities | 133.87 | 228.30 | | 155.70 | 111.68 |
| 885.00 · Wages | 1,750.00 | 26,321.16 | 25,064.86 | 25,197.31 | 19,355.07 |
| Total Expense | 2,761.10 | 43,455.06 | 37,492.81 | 41,917.06 | 30,789.66 |
| Net Ordinary Income | (19,530.65) | 8,660.70 | (32,794.12) | (68,098.37) | 64,117.00 |
| Net Income | (19,530.65) | 8,660.70 | (32,794.12) | (68,098.37) | 64,117.00 |

Exhibit "I" Page 2 of 3

| Creekside Accrual P & L | Mar 18 | Apr 18 | TOTAL |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| Buildertrend Invoice | 36,988.00 | 30,426.80 | 343,339.45 |
| 420.00 · Construction | 55,127.37 | 81,369.61 | 310,445.75 |
| 430.00 · Reimbursed Expenses | | | 1,536.47 |
| 440.00 · Discounts | | 12.72 | 12.72 |
| Total Income | 92,115.37 | 111,809.13 | 655,334.39 |
| **Cost of Goods Sold** | | | |
| 830.00 · Sanitation | 105.00 | 95.00 | 615.04 |
| 500.25 · Licenses, Bonds & Permits | | 106.40 | 991.40 |
| 500.85 · Subcontractors | | | |
| 500.00 · Cost of Goods Sold | 49,234.92 | 80,568.57 | 398,381.36 |
| 500.05 · Job materials | 5,793.29 | 5,600.31 | 31,550.73 |
| 500.10 · Building supplies | 777.49 | 310.00 | 6,941.37 |
| 500.15 · Engineering | | | 1,220.00 |
| 500.20 · Labor | 6,283.08 | 9,181.87 | 60,726.93 |
| 500.45 · Tools and Machinery | 605.14 | 300.00 | 1,173.88 |
| Total COGS | 62,798.92 | 96,162.15 | 501,600.71 |
| Gross Profit | 29,316.45 | 15,646.98 | 153,733.68 |
| **Expense** | | | |
| 555.00 · Bookkeeping | 1,000.00 | 1,000.00 | 6,500.00 |
| 776.00 · Payroll Processing Fees | | | 426.63 |
| 725.00 · Licenses and Fees | | | 720.00 |
| 520.00 · Advertising | 2,964.76 | 3,256.39 | 15,717.88 |
| 535.00 · Automobile and truck expense | 3,159.44 | 1,914.20 | 14,267.28 |
| 550.00 · Bank charges | 27.91 | 23.42 | 1,884.63 |
| 595.00 · Cleaning | 200.00 | 125.00 | 675.00 |
| 599.00 · Crew lunches | 190.44 | 287.15 | 3,198.94 |
| 610.00 · Dues and subscriptions | | | 4,071.88 |
| 680.00 · Fuel | 1,000.17 | 1,127.47 | 6,729.21 |
| 695.00 · Insurance | 1,103.91 | 1,480.61 | 10,771.34 |
| 720.00 · Legal and professional | | 4,875.00 | 6,500.00 |
| 750.00 · Office expense | 1,741.45 | 507.68 | 6,067.49 |
| 810.00 · Rent | 1,120.00 | 1,120.00 | 7,040.00 |
| 855.00 · Telephone | 422.96 | 675.51 | 2,850.93 |
| 880.00 · Utilities | 258.49 | 430.41 | 1,318.45 |
| 885.00 · Wages | 20,818.37 | 18,325.54 | 136,832.31 |
| Total Expense | 34,007.90 | 35,148.38 | 225,571.97 |
| Net Ordinary Income | (4,691.45) | (19,501.40) | (71,838.29) |
| Net Income | (4,691.45) | (19,501.40) | (71,838.29) |

Exhibit "I" Page 3 of 3

Exhibit "J" Page 1 of 3

# Exhibit "J"

| Creekside Cash P & L | Oct 19 - 31, 17 | Nov 17 | Dec 17 | Jan 18 | Feb 18 |
|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | |
| **Income** | | | | | |
| Buildertrend Invoice | | 87,464.11 | 58,753.68 | 40,000.00 | 81,690.00 |
| 420.00 · Construction | 1,400.00 | 20,613.30 | 30,141.72 | 40,495.00 | 80,766.94 |
| 430.00 · Reimbursed Expenses | 1,536.47 | | | | |
| 440.00 · Discounts | | | | | |
| Total Income | 2,936.47 | 108,077.41 | 88,895.40 | 80,495.00 | 162,456.94 |
| **Cost of Goods Sold** | | | | | |
| 830.00 · Sanitation | | 180.04 | 100.00 | 20.00 | 115.00 |
| 500.25 · Licenses, Bonds & Permits | | | 550.00 | 335.00 | |
| 500.85 · Subcontractors | | | | | |
| 500.00 · Cost of Goods Sold | | 15,977.67 | 54,722.31 | 24,499.92 | 99,819.83 |
| 500.05 · Job materials | | 6,307.74 | 780.99 | 4,471.85 | 8,596.55 |
| 500.10 · Building supplies | | 2,108.79 | 3,635.64 | 109.45 | |
| 500.15 · Engineering | | | | | 1,220.00 |
| 500.20 · Labor | | 18,610.51 | 8,688.10 | 10,145.13 | 7,818.24 |
| 500.45 · Tools and Machinery | | | | | |
| Total COGS | | 43,184.75 | 68,477.04 | 39,581.35 | 117,569.62 |
| Gross Profit | 2,936.47 | 64,892.66 | 20,418.36 | 40,913.65 | 44,887.32 |
| **Expense** | | | | | |
| 555.00 · Bookkeeping | 500.00 | 1,000.00 | 1,000.00 | 1,500.00 | 500.00 |
| 776.00 · Payroll Processing Fees | | 85.01 | 170.02 | 171.60 | |
| 725.00 · Licenses and Fees | | | 420.00 | 300.00 | |
| 520.00 · Advertising | | 309.00 | 2,608.41 | 5,032.16 | 1,547.16 |
| 535.00 · Automobile and truck expense | | 3,342.05 | 1,888.85 | 1,464.51 | 2,498.23 |
| 550.00 · Bank charges | 6.00 | 177.58 | 457.43 | 267.41 | 924.88 |
| 595.00 · Cleaning | | | 125.00 | 225.00 | |
| 599.00 · Crew lunches | | 2,121.29 | 53.89 | 500.14 | 46.03 |
| 610.00 · Dues and subscriptions | | 4,071.88 | | | |
| 680.00 · Fuel | | 1,295.65 | 1,694.91 | 796.59 | 814.42 |
| 695.00 · Insurance | | 2,226.50 | 1,232.56 | 1,665.73 | 2,537.23 |
| 720.00 · Legal and professional | | | | 1,625.00 | |
| 750.00 · Office expense | 371.23 | | 1,362.82 | 1,274.16 | 860.65 |
| 810.00 · Rent | | 1,320.00 | 1,120.00 | 1,120.00 | 1,240.00 |
| 855.00 · Telephone | | 534.64 | 827.31 | | 390.51 |
| 880.00 · Utilities | | 248.02 | | 114.15 | |
| 885.00 · Wages | 1,750.00 | 26,321.16 | 25,064.86 | 25,197.31 | 19,355.07 |
| Total Expense | 2,627.23 | 43,052.78 | 38,026.06 | 41,253.76 | 30,714.18 |
| Net Ordinary Income | 309.24 | 21,839.88 | (17,607.70) | (340.11) | 14,173.14 |
| Net Income | 309.24 | 21,839.88 | (17,607.70) | (340.11) | 14,173.14 |

Exhibit "J" Page 2 of 3

| Creekside Cash P & L | Mar 18 | Apr 18 | TOTAL |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| Buildertrend Invoice | 66,113.00 | 30,266.80 | 364,287.59 |
| 420.00 · Construction | 60,128.81 | 82,829.61 | 316,375.38 |
| 430.00 · Reimbursed Expenses | | | 1,536.47 |
| 440.00 · Discounts | | 12.72 | 12.72 |
| Total Income | 126,241.81 | 113,109.13 | 682,212.16 |
| **Cost of Goods Sold** | | | |
| 830.00 · Sanitation | 105.00 | 95.00 | 615.04 |
| 500.25 · Licenses, Bonds & Permits | | 106.40 | 991.40 |
| 500.85 · Subcontractors | | | |
| 500.00 · Cost of Goods Sold | 66,127.66 | 71,644.41 | 332,791.80 |
| 500.05 · Job materials | 5,793.29 | 5,600.31 | 31,550.73 |
| 500.10 · Building supplies | 777.49 | 310.00 | 6,941.37 |
| 500.15 · Engineering | | | 1,220.00 |
| 500.20 · Labor | 6,283.08 | 9,181.87 | 60,726.93 |
| 500.45 · Tools and Machinery | 605.14 | 568.74 | 1,173.88 |
| Total COGS | 79,691.66 | 87,506.73 | 436,011.15 |
| Gross Profit | 46,550.15 | 25,602.40 | 246,201.01 |
| **Expense** | | | |
| 555.00 · Bookkeeping | 1,000.00 | 1,000.00 | 6,500.00 |
| 776.00 · Payroll Processing Fees | | | 426.63 |
| 725.00 · Licenses and Fees | | | 720.00 |
| 520.00 · Advertising | 2,564.76 | 3,656.39 | 15,717.88 |
| 535.00 · Automobile and truck expense | 2,595.66 | 2,336.24 | 14,125.54 |
| 550.00 · Bank charges | 27.91 | 23.42 | 1,884.63 |
| 595.00 · Cleaning | 200.00 | 125.00 | 675.00 |
| 599.00 · Crew lunches | 190.44 | 287.15 | 3,198.94 |
| 610.00 · Dues and subscriptions | | | 4,071.88 |
| 680.00 · Fuel | 1,000.17 | 1,127.47 | 6,729.21 |
| 695.00 · Insurance | 1,103.91 | 2,005.41 | 10,771.34 |
| 720.00 · Legal and professional | | 4,875.00 | 6,500.00 |
| 750.00 · Office expense | 1,811.20 | 507.68 | 6,187.74 |
| 810.00 · Rent | 1,120.00 | 1,120.00 | 7,040.00 |
| 855.00 · Telephone | 422.96 | 675.51 | 2,850.93 |
| 880.00 · Utilities | 386.25 | 451.96 | 1,200.38 |
| 885.00 · Wages | 20,818.37 | 18,325.54 | 136,832.31 |
| Total Expense | 33,241.63 | 36,516.77 | 225,432.41 |
| Net Ordinary Income | 13,308.52 | (10,914.37) | 20,768.60 |
| Net Income | 13,308.52 | (10,914.37) | 20,768.60 |

Exhibit "J" Page 3 of 3

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

# Exhibit "K"

| AP | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| B.C. Plumbing Inc. | 175.00 | | | | | 175.00 |
| Bauer for Power | 350.00 | 11,617.37 | | | | 11,967.37 |
| Best Pots, Inc | 134.40 | | | | | 134.40 |
| Cascade Door and Millwork | 233.81 | 999.98 | | | | 1,233.79 |
| Copy Cat | | | | | (280.45) | (280.45) |
| GEO Consultants Northwest | | 800.00 | | | | 800.00 |
| Home Depot | | | (3.94) | | (3,331.55) | (3,335.49) |
| LesSchwab | | | 141.74 | | | 141.74 |
| Macadam Floor and Design | | 13,139.60 | | | | 13,139.60 |
| McMinnville Water and Light | | 118.07 | | | | 118.07 |
| NorthWest Insulators Inc. | 2,230.00 | 4,420.00 | | | | 6,650.00 |
| Pacific Construction Solutions, Inc. | 18,200.00 | | | | | 18,200.00 |
| ProBuild | 95.68 | 473.25 | (140.82) | (184.87) | | 243.24 |
| RLP Maintenance Inc. | | | | 1,020.00 | | 1,020.00 |
| Sarah Spafford | 360.00 | | | | | 360.00 |
| Simonson Design Lab | | | | | 4,516.50 | 4,516.50 |
| Starkey Construction | | | | 4,300.00 | | 4,300.00 |
| TerraCalc Land Surveying Inc. | 710.00 | | | | | 710.00 |
| Total Comfort Weatherization | 6,246.71 | | | | | 6,246.71 |
| United Tile | | 5,814.48 | | | | 5,814.48 |
| Withers Lumber | 1,651.14 | 7,709.83 | | | | 9,360.97 |
| Yamhill Dirt Works | 871.20 | | | | | 871.20 |
| TOTAL | 31,257.94 | 45,092.58 | (3.02) | 5,135.13 | 904.50 | 82,387.13 |

Exhibit "K" Page 2 of 2

# Exhibit "L"

| Creekside Accounts Receivable | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| B. H. | | 1,500.00 | | | | 1,500.00 |
| C. L. | | | | | 4,730.00 | 4,730.00 |
| C. A. | | | | 5,680.00 | | 5,680.00 |
| D. G. | | | | | 2,680.00 | 2,680.00 |
| H. P. K. H. | | | | | 2,596.40 | 2,596.40 |
| J. C. | | | | | 4,900.00 | 4,900.00 |
| K. K. | | | | | 500.00 | 500.00 |
| T.S. | | 160.00 | | | | 160.00 |
| TOTAL | | 1,660.00 | | 5,680.00 | 15,406.40 | 22,746.40 |

Exhibit "L" Page 2 of 2

# Exhibit "M"

Creekside Balance Sheet

| | Apr 30, 18 |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Checking/Savings | |
| 107 · Key Bank | (121.13) |
| Key Bank 9462 | 14,247.00 |
| Key Bank 9454 | 242.00 |
| Key Bank 9447 | 242.00 |
| Total Checking/Savings | 14,609.87 |
| Accounts Receivable | |
| 112.00 · Accounts receivable | 22,746.40 |
| Total Accounts Receivable | 22,746.40 |
| Other Current Assets | |
| 2120 · Payroll Asset | 2,300.00 |
| 122.00 · Work In Progress | 159,073.87 |
| 125.00 · Note Receivable-Stockholders | 6,224.47 |
| Total Other Current Assets | 167,598.34 |
| Total Current Assets | 204,954.61 |
| Fixed Assets | |
| 140.00 · Vehicles | 4,049.00 |
| 139.00 · Equipment | 31,061.99 |
| 145.00 · Accumulated depreciation | (15,724.99) |
| Total Fixed Assets | 19,386.00 |
| **TOTAL ASSETS** | 224,340.61 |
| **LIABILITIES & EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 211.00 · Post-Petition Accounts Payable | 82,387.13 |
| 200.00 · Pre-Petition Accounts payable | 852,755.86 |
| Total Accounts Payable | 935,142.99 |
| Other Current Liabilities | |
| 235.00 · Swift - New | 98,605.39 |
| 246.00 · Loan Me - Payable | 74,994.73 |
| 240.00 · Funding Circle | 75,369.45 |
| 245.00 · Knight Capitol Funding | 106,671.38 |
| 206.00 · Payroll liabilities | 106.99 |
| Total Other Current Liabilities | 355,747.94 |
| Total Current Liabilities | 1,290,890.93 |
| Total Liabilities | 1,290,890.93 |
| Equity | |

Exhibit "M" Page 2 of 3

| | |
|---|---:|
| 300.00 · Capital Stock | 10,000.00 |
| 310.00 · Retained Earnings | (990,800.36) |
| 350.00 · Owner's Capital | (57,575.74) |
| Net Income | (28,174.22) |
| Total Equity | (1,066,550.32) |
| TOTAL LIABILITIES & EQUITY | 224,340.61 |

Exhibit "M" Page 3 of 3

# Exhibit "N"

| Client | % of Completion | Contract Amount | Billed to Date | WIP | Paid to Date | Margin |
|--------|----------------:|----------------:|---------------:|-----------:|-------------:|-------:|
| J. C. | 60% | 14,200 | 8,520 | 5,680 | 8,520 | 50% |
| K. G. | 91% | 396,293 | 358,814 | 37,479 | 358,814 | 23% |
| D. A. | 5% | 469,938 | 25,000 | 444,938 | 25,000 | 27% |
| T. S. | 49% | 541,334 | 265,005 | 276,329 | 265,005 | 24% |
| C. S. | 83% | 182,865 | 150,936 | 31,929 | 150,936 | 40% |
| A. P. | 7% | 270,000 | 20,000 | 250,000 | 20,000 | 70% |
| J. P. | 60% | 7,959 | 4,775 | 3,184 | 4,775 | 70% |
| **Totals** | | **1,882,589** | **833,050.60** | **1,049,537.90** | **833,050** | |

`

# Exhibit "O"

| Bid Log Report Q1 | Customer | Customer | Design Agreement | Construction Agreement | Time until Groundbreaking | Contract Amount | Margin |
|---|---|---|---|---|---|---|---|
| | Kexxx Krxxxxxxxxx | Kexxx Krxxxxxxxxx | Yes | Yes | 3 months | $750,000 | 23% |
| | | | | | Total | **$750,000** | |

**\*\*\*Q1 Jobs closed but have not mobilized yet**

| Bid Log Report Q2 | Customer | Customer | Design Agreement | Construction Agreement | Time until Groundbreaking | Contract Amount | Margin |
|---|---|---|---|---|---|---|---|
| | Baxx | Baxx | Yes | No | 18-Mar | $980,000 | 30% |
| | Pexxx | Pexxx | no | No | July | $475,000 | 30% |
| | Alxxxxxxx | Alxxxxxxx | No | No | 3 months? | $950,000 | 30% |
| | Saxxxxx | Saxxxxx | No | No | 18-Jun | $700,000 | 30% |
| | McXxx | McXxx | No | No | 1-Apr | $30,000 | 35% |
| | Gaxxxx | Gaxxxx | Yes | No | June | $350,000 | 30% |
| | Alxx Wixxxxx | Alxx Wixxxxx | Yes | No | 1-Jul | $400,000 | 30% |
| | Poxxxxx | Poxxxxx | Yes | No | 2 months | $200,000 | 35% |
| | | | | | Total | **$4,085,000** | |

Exhibit "O" Page 2 of 2

# Exhibit "P"

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W. E. 10/20/17 | | | | W. E. 10/27/17 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 27,680 | - | (27,680) | -100% | 17,045 | 2,936 | (14,109) | -83% |
| COGS -Labor & Material | | | - | | 35,000 | | (35,000) | |
| Gross Profit | 27,680 | - | (27,680) | -100% | (17,955) | 2,936 | 20,891 | -116% |
| Expenses | | | | | | | - | |
| Advertising | | | | | 1,026 | | (1,026) | -100% |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | | | | | 1,100 | | (1,100) | -100% |
| Bookkeeping | 500 | | (500) | -100% | | 500 | 500 | |
| Insurance -Liab, Auto & WC | | | | | | | - | |
| Payroll -Officers | | | | | | | - | |
| Payroll-admin, PR Tax and fees | | | | | | 1,750 | 1,750 | |
| Office & Admin Expenses | | | | | 2,175 | 6 | (2,169) | -100% |
| Rent Expense | | | | | | | - | |
| Repairs & Maintenance | 200 | | (200) | -100% | | | - | |
| Shop Supplies & Small Tools | 250 | | (250) | -100% | | | - | |
| Telephone and Utilities | 1,100 | 371 | (729) | -66% | | | - | |
| US Trustee Fees | | | | | | | - | |
| Total Expense | 2,050 | 371 | | | 4,301 | 2,256 | | |
| Net Ordinary Income | 25,630 | (371) | | | (22,256) | 680 | | |

| Beg Cash | |
|---|---|
| Net Cash In/(Out) | |
| Ending Cash | |

Exhibit "P" Page 2 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W. E. 11/03/17 | | | | W. E. 11/10/17 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 4,080 | - | (4,080) | -100% | - | - | - | #DIV/0! |
| COGS -Labor & Material | | - | - | | 1,000 | 300 | (700) | |
| Gross Profit | 4,080 | - | (4,080) | -100% | (1,000) | (300) | 700 | -70% |
| Expenses | | | - | | | | - | |
| Advertising | 1,750 | - | (1,750) | -100% | | 1,750 | 1,750 | |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | - | - | - | | | | - | |
| Bookkeeping | 500 | - | (500) | -100% | | 500 | 500 | |
| Insurance -Liab, Auto & WC | 3,240 | - | (3,240) | -100% | | | - | |
| Payroll -Officers | | - | - | | | | - | |
| Payroll-admin, PR Tax and fees | | - | - | | | 300 | 300 | |
| Office & Admin Expenses | | - | - | | | (3) | (3) | |
| Rent Expense | 1,120 | - | (1,120) | -100% | | | - | |
| Repairs & Maintenance | | - | - | | | | - | |
| Shop Supplies & Small Tools | 250 | - | (250) | -100% | | | - | |
| Telephone and Utilities | | - | - | | | | - | |
| US Trustee Fees | | - | - | | | | - | |
| Total Expense | 6,860 | - | | | - | 2,547 | | |
| Net Ordinary Income | (2,780) | - | | | (1,000) | (2,847) | | |

| Beg Cash | | | | | | | | |
| Net Cash In/(Out) | | | | | | | | |
| Ending Cash | | | | | | | | |

Exhibit "P" Page 3 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W. E. 11/17/17 | | | | W. E. 11/24/17 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 106,000 | 107,427 | 1,427 | 1% | 25,250 | 650 | (24,600) | -97% |
| COGS -Labor & Material | 61,000 | 22,557 | (38,443) | -63% | 3,000 | 5,919 | 2,919 | 97% |
| Gross Profit | 45,000 | 84,871 | 39,871 | 89% | 22,250 | (5,269) | (21,681) | -97% |
| Expenses | | | - | | | | - | |
| Advertising | | - | - | | | | - | |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | 1,801 | | (1,801) | | | 828 | 828 | |
| Bookkeeping | 500 | 500 | - | 0% | | | - | |
| Insurance -Liab, Auto & WC | | | - | | | 608 | 608 | |
| Payroll -Officers | 8,200 | 6,772 | (1,428) | | | 1,428 | 1,428 | |
| Payroll-admin, PR Tax and fees | 16,500 | 11,666 | (4,834) | | | 4,706 | 4,706 | |
| Office & Admin Expenses | 2,175 | 101 | (2,074) | | 2,175 | 15 | (2,160) | -99% |
| Rent Expense | | 1,000 | 1,000 | | | | - | |
| Repairs & Maintenance | 200 | 648 | 448 | | 200 | | (200) | -100% |
| Shop Supplies & Small Tools | 250 | | (250) | -100% | | | - | |
| Telephone and Utilities | | | - | | 1,100 | 302 | (798) | -73% |
| US Trustee Fees | | | - | | | | - | |
| Total Expense | 29,626 | 20,686 | | | 3,475 | 7,885 | | |
| Net Ordinary Income | 15,374 | 64,185 | | | 18,775 | (13,154) | | |

| Beg Cash | | | | | | | | |
| Net Cash In/(Out) | | | | | | | | |
| Ending Cash | | | | | | | | |

Exhibit "P" Page 4 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | | W. E. 12/01/17 | | | | W. E. 12/08/17 | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | - | | - | | 30,000 | 6,700 | (23,300) | -78% |
| COGS -Labor & Material | 15,000 | 24,828 | 9,828 | 66% | 30,500 | 12,931 | (17,569) | -58% |
| Gross Profit | (15,000) | (24,828) | (9,828) | 66% | (500) | (6,231) | (5,731) | |
| Expenses | | | - | | | | - | |
| Advertising | 2,750 | 2,059 | (691) | -25% | | | - | |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | 1,100 | 1,489 | 389 | 35% | 1,801 | 255 | (1,546) | -86% |
| Bookkeeping | 500 | 500 | - | 0% | | | - | |
| Insurance -Liab, Auto & WC | 3,240 | 1,619 | (1,621) | -50% | | | - | |
| Payroll -Officers | | | - | | | | - | |
| Payroll-admin, PR Tax and fees | | 500 | 500 | | | 400 | 400 | |
| Office & Admin Expenses | | 445 | 445 | | 2,175 | 334 | (1,841) | -85% |
| Rent Expense | 1,120 | | (1,120) | -100% | | 1,120 | 1,120 | |
| Repairs & Maintenance | | | - | | 200 | | (200) | -100% |
| Shop Supplies & Small Tools | 250 | | (250) | -100% | | | - | |
| Telephone and Utilities | | 535 | 535 | | | | - | |
| US Trustee Fees | | | - | | | | - | |
| Total Expense | 8,960 | 7,147 | | | 4,176 | 2,108 | | |
| Net Ordinary Income | (23,960) | (31,975) | | | (4,676) | (8,339) | | |

| Beg Cash |
| Net Cash In/(Out) |
| Ending Cash |

Exhibit "P" Page 5 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W. E. 12/15/17 | | | | W. E. 12/22/17 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a % | Budget | Actual | Variance | As a % |
| Revenue | 130,000 | 45,302 | (84,698) | -65% | 5,680 | 36,894 | 31,214 | 550% |
| COGS -Labor & Material | 88,000 | 16,136 | (71,864) | -82% | 26,000 | 28,263 | 2,263 | 9% |
| Gross Profit | 42,000 | 29,166 | (12,834) | -31% | (20,320) | 8,630 | 28,950 | -142% |
| Expenses | | | - | | | | | |
| Advertising | | | - | | | | - | |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | | 100 | 100 | | | | - | |
| Bookkeeping | 500 | 500 | - | 0% | | | - | |
| Insurance -Liab, Auto & WC | | 608 | 608 | | | 625 | 625 | |
| Payroll -Officers | 8,200 | 6,772 | (1,428) | -17% | | 1,428 | 1,428 | |
| Payroll-admin, PR Tax and fees | 16,500 | 11,129 | (5,371) | -33% | | 5,014 | 5,014 | |
| Office & Admin Expenses | | 600 | 600 | | 2,175 | 309 | (1,866) | -86% |
| Rent Expense | | | - | | | | - | |
| Repairs & Maintenance | | | - | | 200 | | (200) | -100% |
| Shop Supplies & Small Tools | 250 | | (250) | -100% | | | - | |
| Telephone and Utilities | 1,100 | | (1,100) | -100% | | 1,453 | 1,453 | |
| US Trustee Fees | | | - | | | | | |
| Total Expense | 26,550 | 19,709 | | | 2,375 | 8,829 | | |
| Net Ordinary Income | 15,450 | 9,457 | | | (22,695) | (198) | | |

| Beg Cash | |
|---|---|
| Net Cash In/(Out) | |
| Ending Cash | |

Exhibit "P" Page 6 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W. E. 12/29/17 | | | | W. E. 01/05/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 38,459 | - | (38,459) | -100% | 80,000 | - | (80,000) | -100% |
| COGS -Labor & Material | 30,000 | 12,928 | (17,072) | -57% | 68,450 | 196 | (68,254) | -100% |
| Gross Profit | 8,459 | (12,928) | (21,387) | -253% | 11,550 | (196) | (11,746) | -102% |
| Expenses | | | | | | | | |
| Advertising | | 631 | 631 | | 1,750 | 1,750 | - | 0% |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | 1,100 | 2,124 | 1,024 | 93% | 1,801 | 492 | (1,309) | -73% |
| Bookkeeping | | | - | | 500 | 500 | - | 0% |
| Insurance -Liab, Auto & WC | | | - | | 3,240 | (56) | (3,296) | -102% |
| Payroll -Officers | | | - | | | | - | |
| Payroll-admin, PR Tax and fees | | 250 | 250 | | | 300 | 300 | |
| Office & Admin Expenses | | 654 | 654 | | 2,175 | 377 | (1,798) | -83% |
| Rent Expense | | | - | | 1,120 | | (1,120) | |
| Repairs & Maintenance | | | - | | 200 | | (200) | -100% |
| Shop Supplies & Small Tools | | | - | | 250 | | (250) | -100% |
| Telephone and Utilities | | | - | | | | - | |
| US Trustee Fees | | | - | | 4,875 | | (4,875) | -100% |
| Total Expense | 1,100 | 3,659 | | | 15,911 | 3,363 | | |
| Net Ordinary Income | 7,359 | (16,587) | | | (4,361) | (3,559) | | |

| Beg Cash |
|---|
| Net Cash In/(Out) |
| Ending Cash |

Exhibit "P" Page 7 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W. E. 01/12/18 | | | | W. E. 01/19/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 80,000 | 80,000 | - | 0% | 80,000 | | (80,000) | -100% |
| COGS -Labor & Material | 68,450 | 17,792 | (50,658) | -74% | 68,450 | 18,097 | (50,353) | -74% |
| Gross Profit | 11,550 | 62,208 | 50,658 | 439% | 11,550 | (18,097) | (29,647) | -257% |
| Expenses | | | | | | | | |
| Advertising | - | | - | | - | | - | |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | - | | - | | - | | - | |
| Bookkeeping | 500 | 500 | - | 0% | | | - | |
| Insurance -Liab, Auto & WC | - | 624 | 624 | | | 808 | 808 | |
| Payroll -Officers | 8,200 | 6,772 | (1,428) | -17% | | | - | |
| Payroll-admin, PR Tax and fees | 16,500 | 11,180 | (5,320) | -32% | | 6,677 | 6,677 | |
| Office & Admin Expenses | | 148 | 148 | | 2,175 | 261 | (1,914) | -88% |
| Rent Expense | | | - | | | 1,120 | 1,120 | |
| Repairs & Maintenance | | | - | | 200 | | (200) | -100% |
| Shop Supplies & Small Tools | | | - | | | | - | |
| Telephone and Utilities | | | - | | | 734 | 734 | |
| US Trustee Fees | | | - | | | 1,625 | 1,625 | |
| Total Expense | 25,200 | 19,224 | | | 2,375 | 11,225 | | |
| Net Ordinary Income | (13,650) | 42,984 | | | 9,175 | (29,321) | | |

| | | | | |
|---|---|---|---|---|
| Beg Cash | | | | |
| Net Cash In/(Out) | | | | |
| Ending Cash | | | | |

Exhibit "P" Page 8 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W. E. 01/26/18 | | | | W. E. 02/02/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 80,000 | - | (80,000) | -100% | 25,000 | 495 | (24,505) | -98% |
| COGS -Labor & Material | 68,450 | (885) | (69,335) | -101% | 16,250 | 4,555 | (11,695) | -72% |
| Gross Profit | 11,550 | 885 | (10,665) | -92% | 8,750 | (4,060) | (12,810) | -146% |
| Expenses | | | | | | | | |
| Advertising | 1,000 | 100 | (900) | -90% | 1,750 | 3,182 | 1,432 | 82% |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | 1,100 | 481 | (619) | -56% | 2,940 | 1,288 | (1,652) | -56% |
| Bookkeeping | | | - | | 500 | 500 | - | 0% |
| Insurance -Liab, Auto & WC | | 290 | 290 | | 2,300 | | (2,300) | -100% |
| Payroll -Officers | | | - | | - | | - | |
| Payroll-admin, PR Tax and fees | | | - | | - | 600 | 600 | |
| Office & Admin Expenses | | 77 | 77 | | 900 | 1,700 | 800 | 89% |
| Rent Expense | | | - | | 1,120 | 1,120 | - | 0% |
| Repairs & Maintenance | | | - | | 200 | | (200) | -100% |
| Shop Supplies & Small Tools | 250 | | (250) | -100% | 200 | | (200) | -100% |
| Telephone and Utilities | 1,100 | | (1,100) | -100% | - | | - | |
| US Trustee Fees | | | - | | | | - | |
| Total Expense | 3,450 | 948 | | | 9,910 | 8,391 | | |
| Net Ordinary Income | 8,100 | (63) | | | (1,160) | (12,451) | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Beg Cash | | | | | | | | |
| Net Cash In/(Out) | | | | | | | | |
| Ending Cash | | | | | | | | |

Case 17-33893-tmb11     Doc 169     Filed 06/04/18

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W. E. 02/09/18 | | | | W.E. 02/16/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 25,000 | 40,000 | 15,000 | 60% | 25,000 | 102,457 | 77,457 | 310% |
| COGS -Labor & Material | 16,250 | 20,766 | 4,516 | 28% | 16,250 | 49,920 | 33,670 | 207% |
| Gross Profit | 8,750 | 19,234 | 10,484 | 120% | 8,750 | 52,537 | 43,787 | 500% |
| Expenses | | | | | | | | |
| Advertising | - | 570 | 570 | | - | - | - | |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | - | | - | | | | - | |
| Bookkeeping | - | | - | | 500 | 500 | - | 0% |
| Insurance -Liab, Auto & WC | - | | - | | - | 2,537 | 2,537 | |
| Payroll -Officers | - | | - | | 6,800 | 6,854 | 54 | 1% |
| Payroll-admin, PR Tax and fees | - | | - | | 17,000 | 13,494 | (3,506) | -21% |
| Office & Admin Expenses | - | | - | | | 872 | 872 | |
| Rent Expense | - | 120 | 120 | | | | - | |
| Repairs & Maintenance | - | | - | | | | - | |
| Shop Supplies & Small Tools | - | | - | | | | - | |
| Telephone and Utilities | - | | - | | | | - | |
| US Trustee Fees | | | - | | | | - | |
| Total Expense | - | 690 | | | 24,300 | 24,257 | | |
| Net Ordinary Income | 8,750 | 18,544 | | | (15,550) | 28,279 | | |

| Beg Cash | |
|---|---|
| Net Cash In/(Out) | |
| Ending Cash | |

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W.E. 02/23/18 | | | | W.E. 03/02/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 25,000 | 20,000 | (5,000) | -20% | 20,258 | 5,001 | (15,257) | -75% |
| COGS -Labor & Material | 16,250 | 46,081 | 29,831 | 184% | 13,168 | 530 | (12,638) | -96% |
| Gross Profit | 8,750 | (26,081) | (34,831) | -398% | 7,090 | 4,471 | (2,619) | -37% |
| Expenses | | | | | | | | |
| Advertising | - | - | - | | 750 | - | (750) | |
| Adequate Protection Payment(s) | | | | | | | | |
| Auto Expense (Leases and fuel) | - | 2,489 | 2,489 | | 2,940 | 973 | (1,967) | |
| Bookkeeping | | | - | | 500 | 500 | - | |
| Insurance -Liab, Auto & WC | | | - | | 2,300 | | (2,300) | |
| Payroll -Officers | | | - | | - | | - | |
| Payroll-admin, PR Tax and fees | - | 600 | 600 | | - | 2,250 | 2,250 | |
| Office & Admin Expenses | - | 1,914 | 1,914 | | 900 | 3 | (897) | |
| Rent Expense | | | - | | 1,120 | | (1,120) | |
| Repairs & Maintenance | - | 362 | 362 | | 200 | | (200) | |
| Shop Supplies & Small Tools | | | - | | 200 | | (200) | |
| Telephone and Utilities | 800 | 571 | (229) | -29% | 800 | | (800) | -100% |
| US Trustee Fees | | | - | | | | - | |
| Total Expense | 800 | 5,936 | | | 9,710 | 3,726 | | |
| Net Ordinary Income | 7,950 | (32,016) | | | (2,620) | 746 | | |

| Beg Cash | | | | | | | | |
| Net Cash In/(Out) | | | | | | | | |
| Ending Cash | | | | | | | | |

Exhibit "P" Page 11 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W.E. 03/09/18 | | | | W.E. 03/16/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 20,258 | - | (20,258) | -100% | 20,258 | 66,113 | 45,855 | 226% |
| COGS -Labor & Material | 13,168 | 1,749 | (11,419) | -87% | 13,168 | 36,712 | 23,544 | 179% |
| Gross Profit | 7,090 | (1,749) | (8,840) | -125% | 7,090 | 29,401 | 22,310 | 315% |
| Expenses | | | | | | | | |
| Advertising | | | - | | | | - | |
| Adequate Protection Payment(s) | | 1,739 | 1,739 | | | | - | |
| Auto Expense (Leases and fuel) | | | - | | | | - | |
| Bookkeeping | | | - | | 500 | 500 | - | |
| Insurance -Liab, Auto & WC | | | - | | | 814 | 814 | |
| Payroll -Officers | | | - | | 6,800 | | (6,800) | |
| Payroll-admin, PR Tax and fees | | | - | | 17,000 | 7,484 | (9,516) | |
| Office & Admin Expenses | | 270 | 270 | | | | - | |
| Rent Expense | | | - | | | 1,120 | 1,120 | |
| Repairs & Maintenance | | | - | | | | - | |
| Shop Supplies & Small Tools | | | - | | | | - | |
| Telephone and Utilities | | 299 | 299 | | | | - | |
| US Trustee Fees | | | - | | | | - | |
| Total Expense | - | 2,308 | | | 24,300 | 9,917 | | |
| Net Ordinary Income | 7,090 | (4,057) | | | (17,210) | 19,483 | | |

| Beg Cash | | |
|---|---|---|
| Net Cash In/(Out) | | |
| Ending Cash | | |

Exhibit "P" Page 12 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W.E. 03/23/18 | | | | W.E. 03/30/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 20,258 | 50,607 | 30,349 | 150% | 20,258 | 4,521 | (15,738) | -78% |
| COGS -Labor & Material | 13,168 | 36,123 | 22,955 | 174% | 13,168 | 2,470 | (10,698) | -81% |
| Gross Profit | 7,090 | 14,484 | 7,394 | 104% | 7,090 | 2,050 | (5,040) | -71% |
| Expenses | | | | | | | | |
| Advertising | | 416 | 416 | | | | | |
| Adequate Protection Payment(s) | | | - | | | | | |
| Auto Expense (Leases and fuel) | | 1,280 | 1,280 | | | 1,844 | | |
| Bookkeeping | | | - | | | - | | |
| Insurance -Liab, Auto & WC | | | - | | | 290 | | |
| Payroll -Officers | | 6,859 | 6,859 | | | | | |
| Payroll-admin, PR Tax and fees | | 5,929 | 5,929 | | | - | | |
| Office & Admin Expenses | | 4,081 | 4,081 | | | 8 | | |
| Rent Expense | | | - | | | - | | |
| Repairs & Maintenance | | | - | | | | | |
| Shop Supplies & Small Tools | | 105 | 105 | | | | | |
| Telephone and Utilities | | 542 | 542 | | | | | |
| US Trustee Fees | | | - | | | | | |
| Total Expense | - | 19,211 | | | - | 2,143 | | |
| Net Ordinary Income | 7,090 | (4,727) | | | 7,090 | (93) | | |

| Beg Cash |
| Net Cash In/(Out) |
| Ending Cash |

Exhibit "P" Page 13 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W.E. 04/06/18 | | | | W.E. 04/13/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 23,750 | - | (23,750) | -100% | 23,750 | 74,399 | 50,649 | 213% |
| COGS -Labor & Material | 15,438 | 1,180 | (14,258) | -92% | 15,438 | 19,133 | 3,695 | 24% |
| Gross Profit | 8,313 | (1,180) | (9,493) | -114% | 8,313 | 55,267 | 46,954 | 565% |
| Expenses | | | | | | | | |
| Advertising | 750 | 400 | (350) | -47% | | | - | |
| Adequate Protection Payment(s) | | | - | | | 599 | 599 | |
| Auto Expense (Leases and fuel) | | | - | | 2,940 | 828 | (2,112) | -72% |
| Bookkeeping | 500 | 500 | - | 0% | 500 | 500 | - | 0% |
| Insurance -Liab, Auto & WC | | | - | | 2,300 | 667 | (1,633) | -71% |
| Payroll -Officers | | | - | | | | - | |
| Payroll-admin, PR Tax and fees | | 2,250 | 2,250 | | | | - | |
| Office & Admin Expenses | | (375) | (375) | | | | - | |
| Rent Expense | 1,120 | 1,120 | - | 0% | | | - | |
| Repairs & Maintenance | | | - | | | | - | |
| Shop Supplies & Small Tools | | | - | | | | - | |
| Telephone and Utilities | 800 | 315 | (485) | -61% | | | - | |
| US Trustee Fees | | | - | | | | - | |
| Total Expense | 3,170 | 4,210 | | | 5,740 | 2,593 | | |
| Net Ordinary Income | 5,143 | (5,390) | | | 2,573 | 52,674 | | |

| Beg Cash | |
|---|---|
| Net Cash In/(Out) | |
| Ending Cash | |

Exhibit "P" Page 14 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | | W.E. 04/20/18 | | | | W.E. 04/27/18 | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 23,750 | 31,452 | 7,702 | 32% | 23,750 | 7,245 | (16,505) | -69% |
| COGS -Labor & Material | 15,438 | 57,855 | 42,418 | 275% | 15,438 | 4,231 | (11,206) | -73% |
| Gross Profit | 8,313 | (26,403) | (34,716) | -418% | 8,313 | 3,014 | (5,299) | -64% |
| Expenses | | | | | | | | |
| Advertising | | | - | | | | - | |
| Adequate Protection Payment(s) | | | - | | | | - | |
| Auto Expense (Leases and fuel) | | | - | | | | - | |
| Bookkeeping | | | - | | | | - | |
| Insurance -Liab, Auto & WC | | 814 | 814 | | | 947 | 947 | |
| Payroll -Officers | 6,800 | 7,218 | 418 | 6% | | | - | |
| Payroll-admin, PR Tax and fees | 17,000 | 12,761 | (4,239) | -25% | | | - | |
| Office & Admin Expenses | 900 | 0 | (900) | -100% | | | - | |
| Rent Expense | | | - | | | | - | |
| Repairs & Maintenance | 200 | | (200) | -100% | | 595 | 595 | |
| Shop Supplies & Small Tools | 200 | | (200) | -100% | | | - | |
| Telephone and Utilities | - | 504 | 504 | | | 168 | 168 | |
| US Trustee Fees | 1,950 | 4,875 | 2,925 | 150% | | | - | |
| Total Expense | 27,050 | 26,172 | | | - | 1,710 | | |
| Net Ordinary Income | (18,738) | (52,575) | | | 8,313 | 1,303 | | |

| Beg Cash | |
|---|---|
| Net Cash In/(Out) | |
| Ending Cash | |

Exhibit "P" Page 15 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | | W.E. 05/04/18 | | | | W.E. 05/11/18 | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 25,000 | 1,031 | (23,969) | -96% | 25,000 | 70,000 | 45,000 | 180% |
| COGS -Labor & Material | 16,250 | 6,364 | (9,886) | -61% | 16,250 | 50 | (16,200) | -100% |
| Gross Profit | 8,750 | (5,334) | (14,084) | -161% | 8,750 | 69,950 | 61,200 | 699% |
| Expenses | | | | | | | | |
| Advertising | 750 | 841 | 91 | | | | - | |
| Adequate Protection Payment(s) | | | - | | | 392 | 392 | |
| Auto Expense (Leases and fuel) | 2,940 | 492 | (2,448) | -83% | | | - | |
| Bookkeeping | 500 | 500 | - | 0% | | | - | |
| Insurance -Liab, Auto & WC | | - | - | | | | - | |
| Payroll -Officers | | | - | | | | - | |
| Payroll-admin, PR Tax and fees | | 1,750 | 1,750 | | | | - | |
| Office & Admin Expenses | 900 | 2,512 | 1,612 | 179% | | 100 | 100 | |
| Rent Expense | | | - | | | | - | |
| Repairs & Maintenance | | - | - | | | - | - | |
| Shop Supplies & Small Tools | | | - | | | | - | |
| Telephone and Utilities | | - | - | | | - | - | |
| US Trustee Fees | | | - | | | | - | |
| Total Expense | 5,090 | 6,095 | | | - | 492 | | |
| Net Ordinary Income | 3,660 | (11,429) | | | 8,750 | 69,458 | | |

| Beg Cash | |
|---|---|
| Net Cash In/(Out) | |
| Ending Cash | |

Exhibit "P" Page 16 of 17

Creekside Homes, Inc.
Projection of Cash Receipts and Disbursements
For the 31-week Period ended 05.18.18

| For the week ending: | W.E. 05/18/18 | | | | 10/19/17 thru 05/18/18 | | | |
|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | Variance | As a | Budget | Actual | Variance | As a |
| Revenue | 25,000 | 20,541 | (4,459) | -18% | 1,075,486 | 773,772 | (301,714) | -28% |
| COGS -Labor & Material | 16,250 | 56,338 | 40,088 | 247% | 804,640 | 503,120 | (301,520) | -37% |
| Gross Profit | 8,750 | (35,797) | (44,547) | -509% | 270,846 | 270,651 | (195) | 0% |
| Expenses | | | | | - | - | - | |
| Advertising | | 1,885 | 1,885 | #DIV/0! | 12,276 | 13,585 | 1,309 | 11% |
| Adequate Protection Payment(s) | | - | - | #DIV/0! | - | 2,729 | 2,729 | |
| Auto Expense (Leases and fuel) | | 2,364 | 2,364 | #DIV/0! | 21,563 | 17,326 | (4,237) | -20% |
| Bookkeeping | 500 | 500 | - | 0% | 7,500 | 7,500 | - | 0% |
| Insurance -Liab, Auto & WC | 2,300 | 1,331 | (969) | -42% | 18,920 | 12,524 | (6,396) | -34% |
| Payroll -Officers | 6,800 | 7,213 | 413 | 6% | 51,800 | 51,315 | (485) | -1% |
| Payroll-admin, PR Tax and fees | 17,000 | 13,264 | (3,736) | -22% | 117,500 | 114,254 | (3,246) | -3% |
| Office & Admin Expenses | | 2,954 | 2,954 | #DIV/0! | 18,825 | 17,363 | (1,462) | -8% |
| Rent Expense | 1,120 | 1,120 | - | 0% | 7,840 | 7,840 | - | 0% |
| Repairs & Maintenance | 200 | - | (200) | -100% | 2,200 | 1,605 | (595) | -27% |
| Shop Supplies & Small Tools | 200 | | (200) | -100% | 2,550 | 105 | (2,445) | -96% |
| Telephone and Utilities | 200 | 324 | 124 | 62% | 7,000 | 6,118 | (882) | -13% |
| US Trustee Fees | | | - | #DIV/0! | 6,825 | 6,500 | (325) | -5% |
| Total Expense | 28,320 | 30,954 | | | 274,799 | 258,763 | | |
| Net Ordinary Income | (19,570) | (66,751) | | | (3,953) | 11,889 | | |

| | |
|---|---|
| Beg Cash | 3,934 |
| Net Cash In/(Out) | 11,889 |
| Ending Cash | 15,822 |

Exhibit "P" Page 17 of 17

# Exhibit "Q"

American Land Title Association

File No.: 1031-3047789
Printed: 05/24/2018, 9:49 AM
Officer/Escrow Officer: Michelle
Gregor/MWG
Settlement Location:
775 NE Evans Street, McMinnville, OR 97128

**First American Title Company of Oregon**

775 NE Evans Street • McMinnville, OR 97128
Phone: (503)472-4627  Fax: (866)800-7294
**Estimated Settlement Statement**

 First American

Property Address: 1590 SW Harbor Drive, McMinnville, OR 97128
Buyer: Donna C. Montoya
Seller: Andrew A. Burton
Lender: Pacific Residential Mortgage, LLC
Settlement Date: 05/31/2018
Disbursement Date:

| Description | Seller | |
| --- | --- | --- |
| | Debit | Credit |
| **Financial** | | |
| Sale Price | | 220,000.00 |
| | | |
| **Prorations/Adjustments** | | |
| County Taxes  05/31/18 to 07/01/18  @$1,491.42/yr | | 126.67 |
| | | |
| **Title Charges & Escrow / Settlement Charges** | | |
| Title - Owner's Title Insurance (optional) | 750.00 | |
| Policy: ALTA Owners - 2006 STD  to First American Title Company of Oregon | | |
| Title - E-recording Fee | 5.00 | |
| E-recording Fee  to First American Title Company of Oregon | | |
| Title - Government Service Fee-OR | 20.00 | |
| Government Service Fee-OR  to First American Title Company of Oregon | | |
| Title - Escrow Fee | 440.00 | |
| Escrow/Closing Fee  to First American Title Company of Oregon | | |
| Title - Tracking/Maintenance Fee | 150.00 | |
| Tracking/Maintenance Fee  to First American Title Company of Oregon | | |
| | | |
| **Commission** | | |
| Real Estate Commission  to Bella Casa Real Estate Group | 5,500.00 | |
| | | |
| **Government Recording and Transfer Charges** | | |
| Record | 46.00 | |
| Record | | |
| | | |
| **Payoff(s) and Payment(s)** | | |
| Ocwen Loan Servicing LLC | | |
| Principal Balance  to Ocwen Loan Servicing LLC | 84,819.39 | |
| Deffered Prin Bal  to Ocwen Loan Servicing LLC | 12,100.00 | |
| Late Charge  to Ocwen Loan Servicing LLC | 689.79 | |
| Satisfaction Cost  to Ocwen Loan Servicing LLC | 59.50 | |
| Returned Check Fee  to Ocwen Loan Servicing LLC | 25.00 | |

This is a summary of the closing transaction prepared by First American Title Company of Oregon. This document is not intended to replace the
Closing Disclosure form.

Copyright 2015 American Land Title Association.
All rights reserved

File # 1031-3047789
· Printed on 05/24/2018 at 9:49 AM

Exhibit "Q" Page 2 of 21

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

| Description | Seller | |
| --- | --- | --- |
| | Debit | Credit |
| Property Valuation to Ocwen Loan Servicing LLC | 233.06 | |
| Property Inspection Fee to Ocwen Loan Servicing LLC | 288.00 | |
| Int per Demand to 6-13-18 to Ocwen Loan Servicing LLC | 344.68 | |
| | | |
| **Subtotals** | 105,470.42 | 220,126.67 |
| Due To Seller | 114,656.25 | |
| Totals | 220,126.67 | 220,126.67 |

Our wire instructions do not change. If you receive an email or other communication that appears to be from us and contains revised wiring instructions, you should consider it suspect and you must call our office at an independently verified phone number. Do not inquire with the sender.

### Acknowledgement
We/I have carefully reviewed the Estimated ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements to be made on my account or by me in this transaction and further certify that I have received a copy of the Estimated ALTA Settlement Statement. This Estimated Settlement Statement is subject to changes, corrections or additions at the time of final computation of Escrow Settlement Statement. We/I authorize First American Title Company of Oregon to cause the funds to be disbursed in accordance with the Final ALTA Settlement Statement to be provided to me/us at closing.

Seller(s):

_____

Andrew A. Burton

_____

Escrow Officer: Michelle Gregor

This is a summary of the closing transaction prepared by First American Title Company of Oregon. This document is not intended to replace the Closing Disclosure form.

Copyright 2015 American Land Title Association.
All rights reserved

File # 1031-3047789
Printed on 05/24/2018 at 9:49 AM

Exhibit "Q" Page 3 of 21

Case 17-33893-tmb11    Doc 169    Filed 06/04/18



**OCWEN Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

See below for a breakdown of the total amount required to pay off the above-referenced account on or before 06/13/2018, as well as complete payoff instructions.

**Important Note:** If there is an escrow account associated with the mortgage for property taxes and insurance, we may need to pay the tax and insurance bills before this payoff quote expires on 06/13/2018. Any additional disbursements made on behalf of the mortgage will be added to the amounts due on payoff.

| Description | Amount Due |
|---|---|
| Principal | $84,819.39 |
| Interest | $344.68 |
| Property Inspection Fee | $288.00 |
| Property Valuation | $233.06 |
| Returned Check Fee | $25.00 |
| Satisfaction Cost | $59.50 |
| Late Charges | $689.79 |
| Deferred Prin Bal | $12,100.00 |

| Total Amount Due | $98,559.42 |
|---|---|

| | |
|---|---|
| **Next Due Date** | 06/01/2018 |
| **Quoted Date** | 05/14/2018 |
| **Payoff Quote Expiration Date** | 06/13/2018 |
| **Grace Period End Date** | 06/16/2018 |
| **Original Principal Balance** | $113,800.00 |

READ & APPROVED

Given below is a breakdown of the interest that is shown above in the amount of $344.68 due on or before 06/13/2018. Please note that interest is generally charged in arrears. On a normal amortizing loan, the current month's payment will include the interest charges for the previous month. The unpaid principal balance is not the payoff amount.

| From | To | Interest Amount | Interest Rate | Principal Bal. | Daily Per Diem | # Days |
|---|---|---|---|---|---|---|
| 05/01/18 | 05/31/18 | $247.39 | 3.50000% | $84,819.39 | $8.24633000 | 30 |
| 06/01/18 | 06/12/18 | $97.29 | 3.50000% | $$84,550.52 | $8.10758400 | 12 |

NMLS # 1852                                                                  PAYOFFF

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Exhibit "Q" Page 4 of 21

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

 **First American**

First American Title Company of Oregon

825 NE Evans Street
McMinnville, OR 97128
Phn - (503)376-7363
Fax - (866)800-7294

READ & APPROVED

Order No.: 1031-3047789
April 25, 2018

## FOR QUESTIONS REGARDING YOUR CLOSING, PLEASE CONTACT:
**MICHELLE GREGOR,** Escrow Officer/Closer
Phone: (503)472-4627 - Fax: (866)800-7294 - Email:MGregor@firstam.com
First American Title Company of Oregon
775 NE Evans Street, McMinnville, OR 97128

## FOR ALL QUESTIONS REGARDING THIS PRELIMINARY REPORT, PLEASE CONTACT:
**Clayton Carter**, Title Officer
Phone: (503)376-7363 - Fax: (866)800-7294 - Email: ctcarter@firstam.com

### Preliminary Title Report

**County Tax Roll Situs Address:** 1590 SW Harbor Drive, McMinnville, OR 97128

| | | | | | |
|---|---|---|---|---|---|
| 2006 ALTA Owners Standard Coverage | Liability $ | 220,000.00 | Premium $ | | 750.00 |
| 2006 ALTA Owners Extended Coverage | Liability $ | | Premium $ | | |
| 2006 ALTA Lenders Standard Coverage | Liability $ | | Premium $ | | |
| 2006 ALTA Lenders Extended Coverage | Liability $ | TBD | Premium $ | | TBD |
| Endorsement 9.10, 22 & 8.1 | | | Premium $ | | 100.00 |
| Govt Service Charge | | | Cost $ | | 20.00 |
| Other | | | Cost $ | | |

**Proposed Insured Lender: Pacific Residential Mortgage, LLC**

**Proposed Borrower: Donna C. Montoya**

We are prepared to issue Title Insurance Policy or Policies of First American Title Insurance Company, a
Nebraska Corporation in the form and amount shown above, insuring title to the following described land:

Lot 1B, Block 2, MARIE RAE ADDITION to the City of McMinnville, County of Yamhill and State of
Oregon.

and as of April 19, 2018 at 8:00 a.m., title to the fee simple estate is vested in:

Andrew A. Burton

Subject to the exceptions, exclusions, and stipulations which are ordinarily part of such Policy form and
the following:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority
   that levies taxes or assessments on real property or by the public records; proceedings

This report is for the exclusive use of the parties herein shown and is preliminary to the issuance of a
title insurance policy and shall become void unless a policy is issued, and the full premium paid.

Exhibit "Q" Page 5 of 21

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof.

3.  Easements, or claims of easement, not shown by the public records; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.

4.  Any encroachment (of existing improvements located on the subject land onto adjoining land or of existing improvements located on adjoining land onto the subject land), encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the subject land.

5.  Any lien, or right to a lien, for services, labor, material, equipment rental or workers compensation heretofore or hereafter furnished, imposed by law and not shown by the public records.

**The exceptions to coverage 1-5 inclusive as set forth above will remain on any subsequently issued Standard Coverage Title Insurance Policy.**

**In order to remove these exceptions to coverage in the issuance of an Extended Coverage Policy the following items are required to be furnished to the Company; additional exceptions to coverage may be added upon review of such information:**

   A.  Survey or alternative acceptable to the company
   B.  Affidavit regarding possession
   C.  Proof that there is no new construction or remodeling of any improvement located on the premises. In the event of new construction or remodeling the following is required:
      i.   Satisfactory evidence that no construction liens will be filed; or
      ii.  Adequate security to protect against actual or potential construction liens;
      iii. Payment of additional premiums as required by the Industry Rate Filing approved by the Insurance Division of the State of Oregon

6.  Water rights, claims to water or title to water, whether or not such rights are a matter of public record.

7.  City liens, if any, of the City of McMinnville.

   Note: There are no liens as of April 23, 2018. All outstanding utility and user fees are not liens and therefore are excluded from coverage.

8.  Easement as shown on the recorded plat/partition
   For:                         service and utility
   Affects:                     Northerly 10 feet

9.  Notes as shown on the recorded plat/partition of Marie Rae Addition, as follows: "Pursuant to City Ordinance No. 4282, Park Fees for each lot shall be paid at the time of application for a building permit.".

10. Rights, easements and encroachments that may exist by virtue of the common use of foundation, walls and areas by adjacent owners.

H. Deed of Trust and the terms and conditions thereof.

| | |
|---|---|
| Grantor/Trustor: | Andrew A. Burton, a single person |
| Grantee/Beneficiary: | Mortgage Electronic Registration Systems, Inc., MERS solely as a nominee for GMAC Mortgage Corporation, its successors and assigns |
| Trustee: | Western Title & Escrow Company |
| Amount: | $113,800.00 |
| Recorded: | October 06, 2006 |
| Recording Information: | Instrument No. 200623152, Deed and Mortgage Records |

The beneficial interest under said Deed of Trust has been assigned to Deutsche Bank Trust Company Americas as Trustee for RALI 2007QS1, c/o GMAC , by Assignment recorded February 25, 2011, as 201102759.

Substitution of Trustee under said Deed of Trust appointing

| | |
|---|---|
| New Trustee: | LSI Title Company of Oregon, LLC |
| Recorded: | March 10, 2011 |
| Recording Information: | 201103417 |

- END OF EXCEPTIONS -

NOTE: According to the public record, the following deed(s) affecting the property herein described have been recorded within _24_ months of the effective date of this report: NONE

NOTE: We find no matters of public record against Donna C. Montoya that will take priority over any trust deed, mortgage or other security instrument given to purchase the subject real property as established by ORS 18.165.

NOTE: Taxes for the year 2017-2018 PAID IN FULL

| | |
|---|---|
| Tax Amount: | $1,491.42 |
| Map No.: | R4420CB 00808 |
| Property ID: | 485218 |
| Tax Code No.: | 40.0 |

Situs Address as disclosed on Yamhill County Tax Roll:

1590 SW Harbor Drive, McMinnville, OR 97128

## THANK YOU FOR CHOOSING FIRST AMERICAN TITLE!
## WE KNOW YOU HAVE A CHOICE!

*First American Title*

Case 17-33893-tmb11   Doc 169   Filed 06/04/18

**First American**

## ESCROW AGREEMENT
## (SALE)

File No: **1031-3047789 (MWG)**                                     Date: **May 02, 2018**
Seller:  **Andrew A. Burton**
Buyer:  **Donna C. Montoya**
Property Address: **1590 SW Harbor Drive, McMinnville, OR 97128**

### TRANSACTION INSTRUCTIONS

**Please read this document carefully.  It requires the use of individual arbitration to resolve disputes instead of jury trials or class actions.**

To:  **First American Title Company of Oregon**,  hereinafter "Escrow Agent"

**Real Property Description:**  As set forth in Preliminary Title Report issued by **First American Title Company of Oregon**, Order/File No. **1031-3047789** dated **April 19, 2018** a copy of which has been **read and approved by Seller and Buyer.**

**Seller** deposits with Escrow Agent, pursuant to these instructions, the following:

- Fully executed Statutory Warranty Deed
- 1099 Input Form or Seller Certification
- Affidavit of Existing Construction
- All other documents delivered by Seller in connection with the closing
-

And authorizes delivery, release, and recording of documents when you hold for the account of the Seller the sum as shown on the attached Estimated Settlement Statement, and, further authorizes credits, deductions and adjustments as set forth on the attached Estimated Settlement Statement.  Certain items shown on the settlement statement are estimates only and the final figures may be adjusted to accommodate exact amounts required at the time of disbursement.

**Buyer** deposits with Escrow Agent, pursuant to these instructions, the following:

- Funds to close as shown on the Estimated Settlement Statement
- Fully executed loan documents
- Copy of Statutory Warranty Deed which has been read and approved
- All other documents delivered by Buyer in connection with the closing

And authorizes delivery, release and recording of documents when you are prepared to:

1.    Issue an Owner's Title Insurance Policy (ALTA 2006) in the amount of the sales price, insuring the Grantee on the deed deposited by Seller (which has been read and approved by Buyer), as the owner of that certain real property referenced above, subject to (a) the exclusions, conditions and stipulations as contained in the policy, (b) the exceptions not shown as deleted on the marked-up Preliminary Title Report read and approved by Buyer, and (c) all documents recorded at the closing (including, without limitation, all deeds of trust).

And, further authorizes a) if Buyer is obtaining a new loan, recording and/or release of any documents required by or on behalf of Lender; and b) credits, deductions and adjustments as set forth on the attached Estimated Settlement Statement. Certain items shown on the settlement statement are estimates only and the final figures may be adjusted to accommodate exact amounts required at the time of disbursement.

## AUTHORIZATIONS

**If your closing occurs between July 1st and date the tax roll is certified by the county, please be advised of the following:**

**Taxes:** Closing tax prorations for the current year are to be based upon **2017-2018** taxes, which is accepted by the undersigned as a final proration for the purposes of the escrow closing. The undersigned will not hold First American Title Company of Oregon responsible for any re-proration caused by any increase or decrease of the tax amount due.

The Buyer understands that the 1/3 real property taxes will be due and payable by November 15th. Buyer acknowledges that they will need to contact **Yamhill** Tax Collector's office to obtain the tax payment information if the tax statement is not received by November 1st, in order to avoid any delinquent charges.

**Prorate:** You are to prorate taxes in accordance with the terms of the purchase and sale agreement or ORS 311.275 if the purchase and sale agreement is silent on prorations.

**Fire Insurance:** The parties are to secure fire insurance outside of escrow to protect their interest(s) as they may appear.

**Counterpart:** These instructions may be signed in counterpart. Escrow Agent may consider, upon receipt, all duly executed counterparts to be a single instruction.

**Fax/Scan/PDF:** Escrow Agent is authorized to complete all necessary actions set forth herein upon receipt of a signed facsimile (FAX), scan or PDF of these instructions without receipt of original signed instructions.

**Electronic Transfer:** Escrow Agent may, in its discretion, receive and/or disburse any funds in connection with this agreement by electronic (wire) transfer. If required by any of the parties to utilize this method of transfer, the requesting party agrees to pay any reasonable fee as assessed by Escrow Agent for this service.

**Deposits:** Parties understand and agree that all checks, money orders or drafts will be processed for collection in the normal course of business. Parties further understand that all funds required to close must be payable to Escrow Agent and must be **collected funds**, as required by Federal and State or Oregon statutes and regulations prior to the Escrow Agent's disbursement of any sums. Escrow Agent may commingle funds received with escrow funds of others, and may, without limitation, deposit such funds in its custodial or escrow accounts with any reputable trust company, bank, savings bank, savings association or other financial services entity. It is understood that Escrow Agent, except by virtue of separate signed instructions as required by State of Oregon regulation, shall be under no obligation to invest the funds deposited on behalf of any depositor, nor shall it be accountable for any earnings or incidental benefit attributable to the funds which may be received by Escrow Agent while it holds such funds.

The undersigned are hereby informed that Escrow Agent deposits all funds into a non-interest bearing account and receives or may receive certain credits and benefits including, without limitation, checks, deposit slips, data processing and account services from or through various financial entities as a result of the banking relationships maintained in the regular course of its escrow and title insurance business. *The undersigned hereby waive any and all rights or claims with respect to such credits and benefits received by the Escrow Agent or any affiliates thereof.* A good faith estimate of the benefits received by Escrow Agent is $32.16 (based on 2001 results) per escrow transaction. This disclosure is made in compliance with Oregon Administrative Rule 863-50-065.

Any funds remaining on deposit after closing or refunds received by Escrow Agent will be refunded to the party whose account was charged. No further instructions will be required by any party prior to the disbursement of any such refund by Escrow Agent.

Escrow Agent will charge an accounting fee of $10.00 for each month any funds are held after one (1) month in the event the person(s) entitled to such funds, after reasonable and diligent effort, cannot be found. Escrow Agent may charge a reasonable fee for replacement and/or stale dated checks.

**Oregon Tax Withholding:** When applicable, parties authorize and instruct Escrow Agent to withhold and submit the necessary forms and sums, if any, to the Oregon Department of Revenue pursuant to Chapter 864, Oregon Laws 2007. When this amount is based upon net proceeds, escrow is to use the final net proceeds as set out in the Final Settlement Statement.

**Copies:** The undersigned authorize distribution of these escrow instructions and/or estimated or final settlement statements prepared on my behalf to any designee, real estate broker/agent or lender identified in this transaction.

**Closing:** Closing is defined, for purposes of this agreement, as the time of the recording of all documents as required by the parties herein. Escrow Agent shall be entitled to payment of all fees charged for services provided at the time of closing. Any funds held for satisfaction/release of liens and encumbrances or to meet other conditions of this escrow may be transferred from this escrow account to an appropriate department or escrow for subsequent processing.

Escrow Agent is authorized to request, on behalf of Borrower, reconveyances of any trust deeds that are paid in accordance with these instructions and to utilize the provisions of ORS 86.720 et seq in order to release the lien of record, if necessary.

**AGREEMENTS**

**Dispute Resolution: Please read this arbitration provision carefully. It requires the resolution of disputes by arbitration on an individual basis rather than by jury trials or class actions.**

**(a)** The parties acknowledge that they are entering into this arbitration agreement in connection with escrow services related to a real estate transaction. The parties agree that **all disputes and claims involving Escrow Agent that arise out of or relate to the escrow services or related real estate transaction in any way must be resolved by arbitration.** This arbitration agreement is intended to be broadly interpreted, and the obligation to arbitrate includes disputes or claims brought by or against the parties' respective affiliates, owners, agents, employees, representatives, predecessors, successors, assigns, and any beneficiaries of the escrow services, such as those with an interest in the underlying real estate transaction or who are or intend to be occupants, tenants, or owners of the property. Notwithstanding the foregoing, any party may bring an individual action in small claims court. Any dispute as to the arbitrability of claims or the scope or enforceability of this arbitration provision, or as to the interpretation of paragraph (d) below, is for the court to decide. The services provided by Escrow Agent evidence a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of the Escrow.

**(b) Arbitration Procedures.** The arbitrator shall be bound by the terms of this arbitration provision. The arbitration will be governed by the Commercial Arbitration Rules or, where applicable, the Consumer Arbitration Rules (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this arbitration provision. The AAA Rules are available online at www.adr.org or by calling the AAA at 1-800-778-7879. The AAA shall administer the arbitration. If the AAA is unavailable, the arbitration will be administered by another arbitration provider that the parties agree to or that the court selects. Arbitrators may consider but shall not be bound by rulings in prior arbitrations involving different customers. Arbitrators shall be bound by rulings in prior arbitrations involving the same customer to the extent required by applicable law. Unless the parties agree

Page 3 of 6

otherwise, any in-person arbitration hearings shall be in the county in which the underlying real estate at issue in the transaction is located.

**(c) Arbitration Costs.** The Escrow Agent will pay all AAA filing, administrative, and arbitrator fees for any arbitration that the Escrow Agent commences. If another party commences arbitration and the value of that claim is $75,000 or less (to either party), the Escrow Agent will pay all AAA fees. If, however, the arbitrator finds that the substance of such a claim or the relief sought is frivolous or brought for an improper purpose (as measured by the standards in Federal Rule of Civil Procedure 11(b)), then the payment of all AAA fees shall be governed by the AAA Rules.

**(d) Prohibition of Class or Representative Actions and Non-Individualized Relief. UNDER THIS AGREEMENT, ANY CLAIM MUST BE BROUGHT ONLY IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS A PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING.** Further, unless all parties agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a class, representative, or private attorney general proceeding. The arbitrator may award any relief that a court could award, so long as the relief is individualized to the claimant and would not affect other persons. No party may seek non-individualized relief that would affect persons other than the parties themselves. If a court decides that applicable law precludes enforcement of any of this paragraph's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court.

**Interpleader:** Notwithstanding the preceding section, Escrow Agent shall have the option of interpleading funds in the Circuit Court of Oregon, including the Small Claims Division of same, as may be appropriate, in the event of a dispute regarding the disposition of any funds held by Escrow Agent, where the substance of the underlying dispute involves competing claims to the funds held in escrow.

**Limited Power of Attorney:** The undersigned hereby grant Escrow Agent Limited Power of Attorney to correct and initial all typographical or clerical errors discovered in any or all of the closing documentation required to be executed by any of the parties hereto. In the event Escrow Agent exercises this Limited power of Attorney, a copy of the document(s) corrected and/or initialed will be sent to the affected party.

## EXCLUSIONS

**COMPLIANCE WITH VARIOUS LAWS OR STATUTES:** Escrow Agent has no liability or responsibility with respect to any matters connected with the following (unless expressly authorized herein or by separate written instructions acknowledged by Escrow Agent);

1.  Compliance with the requirements of the Consumer Credit Protection Act or Interstate Land Sales Act, or similar laws;
2.  Compliance with the requirements of the Oregon Revised Statutes 537.330 (relating to water rights), 448.271 (relating to well testing) and any similar laws;
3.  Compliance with the obligation to disclose the existence of lead based paint as required by federal regulation 24 CFR Part 35 and 40 CFR Part 35 et seq and any other related statute or regulation; and
4.  Compliance with collection, withholding, reporting or payment of any amounts due under Section 1445 and 6039C of the Internal Revenue Code, as amended, regulations adopted thereunder, and any other related statute or regulation (Foreign Investment in Real Property Tax Act, commonly referred to as FIRPTA). Notwithstanding the fact Escrow Agent assumes no liability or responsibility to the parties for compliance with FIRPTA, Escrow Agent reserves the right to take any action required by such law and/or regulation without further instructions of the parties.

## REPRESENTATIONS

**Compliance with Earnest Money Agreement:** All terms and provisions of the earnest money agreement, amendments or addenda thereto, have been complied with to the satisfaction of the undersigned or will be completed outside of this escrow. Escrow Agent is not responsible for any matters except as set forth in this agreement.

**Utilities:** The undersigned acknowledge that water, sewer, waste collection, electricity, and other utility charges and inventory for fuel, including any final billings will be adjusted outside this escrow by the respective parties and Escrow Agent shall have no obligation or responsibility for such adjustment.

**Compliance with Escrow Agreement:** The undersigned acknowledge that they have and shall have a continuing obligation to cooperate with Escrow Agent in good faith to enable Escrow Agent to fulfill its responsibilities under this agreement. Such obligations shall survive the closing of the transaction described herein and shall include, without limitation, the obligation to; a) disclose to Escrow Agent any liens, encumbrances or any other rights, claims or matters known to the parties which affect or relate to the property and transaction referred to in this agreement; b) return to Escrow Agent for proper disposition any funds, documents or other property which are, for any reason, improperly or mistakenly released to any persons; c) pay any charges, advances or expenses that are properly chargeable to the parties; and d) to proceed pursuant to the provisions of ORS 86.720 to take those steps necessary to secure an appropriate deed of reconveyance of any trust deed which has been paid and fully satisfied.

**Practice of Law/Advice:** The undersigned acknowledge that Escrow Agent is not licensed to practice law and that Escrow Agent's duties and obligations under this agreement are limited to those of an escrow holder. The undersigned have not been referred to any named attorney(s) or discouraged from seeking the advice of an attorney but have been requested to seek legal counsel of their own choosing, at their own expense, if they have any doubts or questions concerning any aspect of this transaction.

**Other Obligations:** The undersigned acknowledge that, to the extent other obligations exist between them as a result of this transaction that are not specifically set forth herein, they are individually responsible for the execution thereof and Escrow Agent is not obligated for matters except as specifically set forth in this agreement.

**Review:** The undersigned acknowledge that they have been afforded adequate time and opportunity to read and understand the escrow instructions and all other documents referred to herein.

### SPECIAL INSTRUCTIONS

**PLEASE READ THE PRELIMINARY TITLE REPORT AND YOUR SETTLEMENT STATEMENT CAREFULLY BEFORE SIGNING THIS DOCUMENT. BE SURE THAT ALL FACTS KNOWN TO YOU ARE ACCOUNTED FOR IN THIS ESCROW. THE ESCROW AGENT HEREIN IS A NEUTRAL THIRD PARTY AND CANNOT ADVISE YOU OR PROTECT YOUR LEGAL RIGHTS. YOU SHOULD CONSULT LEGAL COUNSEL FOR SUCH ADVICE AND PROTECTION.**

The undersigned has read the Preliminary Title Report and Estimated Settlement Statement attached to the original Escrow Instructions, as well as the Escrow Instructions in this escrow, and any Amendments thereto.

The undersigned represents to Escrow Agent and its underwriter that there are no existing liens, assessments, taxes, deferred taxes, unpaid water or sewer bills, or any other obligations which are the responsibility of the undersigned and which are not shown on the above documents. The undersigned understands and agrees that any obligation known to it and not disclosed herein, remains the responsibility of the undersigned subsequent to the closing of this escrow. The undersigned further understands and agrees that any payoffs made on its behalf in this escrow are made by Escrow Agent and its underwriter with complete reliance on figures supplied by the lender, creditor or taxing agency. Such figures may not be accurate. In the event that additional funds are required to complete said payoffs, the undersigned hereby agrees that it will immediately, upon request by and its underwriter, provide the additional funds needed to complete said payoffs.

**THE PARTIES ACKNOWLEDGE THAT BY THE APPROVAL OF THE ESTIMATED SETTLEMENT STATEMENT REFERRED TO IN THESE INSTRUCTIONS, THEY HAVE AGREED AS TO THE ALLOCATION OF COSTS ASSOCIATED WITH THE TITLE PREMIUMS REQUIRED, IF ANY, FOR THE PROTECTION REQUIRED FOR THE PURCHASER IN COMPLIANCE WITH HOMEBUYER PROTECTION ACT.**

Notwithstanding reference, if any, in the purchase and sale agreement regarding transfer of water rights, the parties acknowledge that Escrow Agent will not be responsible for any such transfer and that the parties are solely responsible for such transfer outside this escrow.

**YOU ARE REVIEWING, APPROVING AND SIGNING IMPORTANT DOCUMENTS. LEGAL CONSEQUENCES FOLLOW FROM THE SELECTION AND USE OF THESE DOCUMENTS. THESE CONSEQUENCES AFFECT YOUR RIGHTS AND OBLIGATIONS. YOU MAY CONSULT AN ATTORNEY ABOUT THESE DOCUMENTS. YOU SHOULD CONSULT AN ATTORNEY IF YOU HAVE QUESTIONS OR CONCERNS ABOUT THE TRANSACTION OR ABOUT THE DOCUMENTS. IF YOU WISH TO REVIEW TRANSACTION DOCUMENTS THAT YOU HAVE NOT YET SEEN, PLEASE CONTACT THE ESCROW AGENT.**

**IT IS UNDERSTOOD BY THE PARTIES SIGNING THE ABOVE ESCROW INSTRUCTIONS OR THOSE ESCROW INSTRUCTIONS WHICH ARE ATTACHED HERETO THAT SUCH INSTRUCTIONS CONSTITUTE THE WHOLE AGREEMENT BETWEEN THIS FIRM AS AN ESCROW AGENT AND YOU AS A PRINCIPAL TO THE ESCROW TRANSACTION. THESE INSTRUCTIONS MAY NOT INCLUDE ALL THE TERMS OF THE AGREEMENT WHICH IS THE SUBJECT OF THIS ESCROW. READ THESE INSTRUCTIONS CAREFULLY AND DO NOT SIGN THEM UNLESS THEY ARE ACCEPTABLE TO YOU.**

Dated: _5/25/18_____

**SELLER(S):**

_____
Andrew A. Burton


Seller's Forwarding Address: ,
Home Phone:

**BUYER(S):**

_____
Donna C. Montoya


Buyer's Forwarding Address: **495 SW Cypress St., McMinnville, OR 97128**
Home Phone:

Accepted this _25_ day of _May_____, 20_18_.

First American Title Company of Oregon

By: _____

Page 6 of 6





THIS SPACE RESERVED FOR RECORDER'S USE

After recording return to:
Donna C. Montoya
495 SW Cypress St.
McMinnville, OR 97128

Until a change is requested all tax
statements shall be sent to the
following address:
Donna C. Montoya
495 SW Cypress St. *1590 SW Harbor Dr*
McMinnville, OR 97128

File No.: 1031-3047789 (MWG)
Date:    May 02, 2018

## STATUTORY WARRANTY DEED

**Andrew A. Burton**, Grantor, conveys and warrants to **Donna C. Montoya** , Grantee, the following
described real property free of liens and encumbrances, except as specifically set forth herein:

**LEGAL DESCRIPTION:** Real property in the County of Yamhill, State of Oregon, described as follows:

**Lot 1B, Block 2, MARIE RAE ADDITION to the City of McMinnville, County of Yamhill and
State of Oregon.**

**Subject to:**
Covenants, conditions, restrictions and/or easements, if any, affecting title, which may appear in the
public record, including those shown on any recorded plat or survey.

The true consideration for this conveyance is **$220,000.00**.  (Here comply with requirements of ORS 93.030)

Exhibit "Q" Page 14 of 21

BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON TRANSFERRING FEE TITLE SHOULD INQUIRE ABOUT THE PERSON'S RIGHTS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010. THIS INSTRUMENT DOES NOT ALLOW USE OF THE PROPERTY DESCRIBED IN THIS INSTRUMENT IN VIOLATION OF APPLICABLE LAND USE LAWS AND REGULATIONS. BEFORE SIGNING OR ACCEPTING THIS INSTRUMENT, THE PERSON ACQUIRING FEE TITLE TO THE PROPERTY SHOULD CHECK WITH THE APPROPRIATE CITY OR COUNTY PLANNING DEPARTMENT TO VERIFY THAT THE UNIT OF LAND BEING TRANSFERRED IS A LAWFULLY ESTABLISHED LOT OR PARCEL, AS DEFINED IN ORS 92.010 OR 215.010, TO VERIFY THE APPROVED USES OF THE LOT OR PARCEL, TO DETERMINE ANY LIMITS ON LAWSUITS AGAINST FARMING OR FOREST PRACTICES, AS DEFINED IN ORS 30.930, AND TO INQUIRE ABOUT THE RIGHTS OF NEIGHBORING PROPERTY OWNERS, IF ANY, UNDER ORS 195.300, 195.301 AND 195.305 TO 195.336 AND SECTIONS 5 TO 11, CHAPTER 424, OREGON LAWS 2007, SECTIONS 2 TO 9 AND 17, CHAPTER 855, OREGON LAWS 2009, AND SECTIONS 2 TO 7, CHAPTER 8, OREGON LAWS 2010.

Dated this _25_ day of _May_, 20_18_ .

_____

Andrew A. Burton

STATE OF　　Oregon　　　　　　　)
　　　　　　　　　　　　　　　　　　　)ss.
County of　　Yamhill　　　　　　　)

This instrument was acknowledged before me on this _25_ day of _May_, 20_18_
by **Andrew A. Burton.**

_Michelle W Gregor_

Notary Public for Oregon
My commission expires: _4/30/21_

OFFICIAL STAMP
MICHELLE WYANN GREGOR
NOTARY PUBLIC-OREGON
COMMISSION NO. 961746
MY COMMISSION EXPIRES APRIL 30, 2021



First American True Company of Oregon
775 NE Evans Street
McMinnville, OR 97128
(503)565-2124
Fax - (866)800-7294

| | |
|---|---|
| To: **First American Title Company of Oregon**<br>**Michelle Gregor, Escrow Officer**<br>Re: **1590 SW Harbor Drive, McMinnville, OR 97128** ("Property")<br>Seller: **Andrew A. Burton** | File No.: 1031-3047789 (MWG)<br>Date: May 14, 2018 |

| **Give form to requestor. Do not send to the IRS.** |
|---|

### INFORMATION REQUEST FORM – For IRS 1099-S Reporting For Real Estate Transactions

<table>
<tr>
<td rowspan="6" style="writing-mode:vertical">Print or type – follow all instructions carefully</td>
<td colspan="2">Name (as shown on your income tax return)   <em>Andrew Burton</em></td>
</tr>
<tr>
<td colspan="2">Business name/disregarded entity name, if different from above</td>
</tr>
<tr>
<td colspan="2">Check appropriate box: ☒ Individual / Sole proprietor   ☐ Corporation (exempt from 1099-S reporting)   ☐ Partnership   ☐ Trust/estate<br>☐ Limited liability company. For LLC, enter the tax classification (D=disregarded entity, C=corporation, S=S Corporation, P=Partnership ▶ _____<br>☐ Other (<em>i.e. Bankrupts, etc. – see instructions</em>) ▶ _____</td>
</tr>
<tr>
<td>Forwarding Street Address (your address after closing)<br><em>1590 SW Harbor Dr.</em></td>
<td>Percentage Owned<br>☒ 100%   ☐ Other: _____ %</td>
</tr>
<tr>
<td>City, State, and Zip code <em>McMinnville, OR 97128</em></td>
<td>Number of sellers including you</td>
</tr>
</table>

**Part I**   **Taxpayer Identification Number (TIN)**

Enter your taxpayer identification number ("TIN") in the appropriate box. The TIN provided must match the name given on Line 1 to avoid the imposition, under the Internal Revenue Code, of civil or criminal penalties for failing to furnish a correct TIN and to insure the TIN passes the IRS's Name/TIN matching software's TIN matching process which we utilize. For individuals, this is your social security number (SSN). However for a resident alien, sole proprietor, or disregarded entity, see "Specific Instructions" below. For other entities, it is your employer identification number (EIN). **Note:** If multiple sellers are involved, see "General Instructions" below.

Social security number
XXXXXXXXXXXXXX
or
Employer identification number

**Part II**   **Certification of U.S. Person - **IMPORTANT** SIGN HERE IF YOU ARE A U.S. PERSON**

Under penalties of perjury, I certify that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), **and**
2. I am a U.S. citizen or other U.S. person (defined below).

Sign Here   **U.S. person ▶** _(signature)_    Date ▶ 5/25/18

**Part III**   **Certification of Foreign Person - **IMPORTANT** SIGN HERE IF YOU ARE FOREIGN; SIGN ABOVE IF YOU ARE A U.S. PERSON**

Under penalties of perjury, I certify that:
1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), **and**
2. I am a Foreign Person (defined below).

Sign Here   **Foreign person ▶** _____    Date ▶

**GENERAL INSTRUCTIONS**
Section references are to the Internal Revenue Code unless otherwise noted.

**Purpose of Form**
A person who is required to file an information return on real estate with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer number (ITIN), adoptive taxpayer identification number(ATIN) or employer identification number (EIN).
*Definition of a U.S. Person.* For federal tax purposes, you are considered a U.S. person if you are:
• An individual who is a U.S. citizen or U.S. resident alien,
• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
• An estate (other than a foreign estate), or
• A domestic trust (as defined in Regulations section 301.7701-7).
*Definition of a Foreign Person.*
A foreign person includes a nonresident alien individual, foreign corporation, foreign partnership, foreign trust, foreign estate, and any other person that is not a U.S. person. It also includes a foreign branch of a U.S. financial institution if the foreign branch is a qualified intermediary. In most cases, the U.S. branch of a foreign corporation or partnership is treated as a foreign person.
**Requirement to Furnish TIN & Penalties for Failure**
You are required by law to provide us with your correct taxpayer identification number ("TIN"). If you do not provide us with your correct taxpayer identification number ("TIN"), you may be subject to civil or criminal penalties imposed by law. If we disclose or use your TIN in violation of federal law, we may be subject to civil or criminal penalties imposed by law.

**Multiple Sellers**
Each seller must complete a separate form. Spouses who hold title as tenants in common, joint tenants, tenants by the entirety, or community property will be treated as a single seller unless we are instructed otherwise.
**SPECIFIC INSTRUCTIONS**
Please review chart "What Name and Number to Give" on page 2.
*Individuals.* You must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.
If more than one name is listed, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.
**Note.** ITIN Applicant: Enter your individual name as it was entered on your form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.
**Limited liability company (LLC).** Check the "Limited liability company" box only and enter the appropriate code for the tax classification ("D" for disregarded entity, "C" for corporation, "P" for partnership) in the space provided and follow the instructions on the next page.
*(Specific Instructions Continued on Next Page)*

**For Escrow Use Only – Additional File Information**

| [ ] Change<br>[ ] Void<br>[ ] Delete | No. of 1099-S Forms required for this file? | Is Name/Entity Party a 'Non-Record' Seller?<br>Type is: [ ] H/W or Individual   [ ] Trust/Business | Is Property part of an Exchange?<br>[ ] YES   [ ] NO |
|---|---|---|---|

**For Escrow Use Only – Required for 1099-S Data Entry Only (No entry in FAST)**

| [ ] Add<br>[ ] Change<br>[ ] Delete | Contract Sales Price<br>$ | Buyer's Part of Real estate Tax<br>$ | Actual Settlement Date |
|---|---|---|---|

**Exhibit "Q" Page 16 of 21**


*First American*

File No: __1031-3047789__          Transferor's Name:  **Andrew A. Burton**
Property Address or Description:  __1590 SW Harbor Drive, McMinnville, OR 97128__

**Preliminary Statement regarding Exempt Status**

Tax Withholding for Certain Transfers of Oregon Real Property Interests
Oregon Revised Statutes 314.258

Please read over and complete this form; it will be used to help us determine whether or not escrow needs to withhold tax which may be due to the State of Oregon because of the sale of this property. Generally speaking, if you are a resident of the State of Oregon, or are a C corporation doing business in this State, escrow does not need to withhold tax. Please read through the attached list and mark any and all that apply. **If you do not return this form to us, or check "None of the Above", then we will need additional information and/or forms to be completed, and you may be subject to Oregon tax withholding.** For additional information on withholding you may wish to check out the Department of Revenue's websites at:

http://www.oregon.gov/DOR/PERTAX/nonresident_withholding.shtml and
http://www.oregon.gov/DOR/forms/FormsPubs/form-or-18-wc-tpv-18_101-183_2016.pdf

The undersigned transferor hereby affirms **UNDER PENALTY OF PERJURY** that, **as of the date of closing** and with respect to the sale of the above referenced property closed through the above referenced escrow, the undersigned transferor is and/or the transaction involves **(check all that apply)**:

- [x] An individual resident of Oregon residing at: _____
- [ ] A federal, state or local governmental entity or authority
- [ ] An individual that has delivered **written assurance** that the sale qualifies for exclusion of gain as the principal residence. Use Fast form *Certification of Exemption from Withholding Tax for Transfers of Certain Oregon Real Property Interests (form ORNOWHCERE)* to document written assurance.
- [ ] A personal representative, conservator, bankruptcy trustee or other person acting under judicial review.
- [ ] An estate
- [ ] A trust that is not a disregarded entity (separate Employer Identification Number and trust is irrevocable)
- [ ] A "C" corporation formed in, or registered to do business in, Oregon
- [ ] An "S" corporation, general partnership, limited partnership or non-profit corporation
- [ ] A limited liability company that is not taxed as a corporation and is not a disregarded entity (separate Employer Identification Number and more than one member)
- [ ] A transfer in a conveyance in lieu of foreclosure of a mortgage, trust deed or other security instrument, or a land sale contract, with no additional consideration
- [ ] Total consideration is $100,000 or less
- [ ] None of the above

_____          _____          5/25/18
*(Signature of transferor/authorized signer)*          Title, if applicable          Date

_____          _____          _____
*(Signature of transferor/authorized signer)*          Title, if applicable          Date

**IF YOU CHECK "NONE OF THE ABOVE," YOU MUST COMPLETE OREGON DEPARTMENT OF REVENUE FORM WC, AND SUBMIT THE APPLICABLE FORM TO THE CLOSING AGENT AT THE CLOSING APPOINTMENT OR SOONER. CONTACT YOUR CLOSING AGENT OR THE OREGON DEPARTMENT OF REVENUE TO OBTAIN THOSE FORMS.**

 **First American**

First American Title Company of Oregon
775 NE Evans Street
McMinnville, OR 97128
(503)565-2124
Fax - (866)800-7294

Re **1590 SW Harbor Drive, McMinnville, OR 97128**
**("Property")**

File No.: **1031-3047789 (MWG)**

## PROCEEDS/FUNDS DISBURSEMENT INSTRUCTIONS

The undersigned directs that the proceeds/funds due will be disbursed in the following manner:

[X] Held for pick up at this office (ID will be required)
[ ] Sent via overnight delivery **OR** [ ] Sent via regular mail
    Mailing Address: _____
[ ] Other: _____
[✓] Sent via wire transfer (if checked, **Attach wiring instructions of <u>receiving bank</u> or fill in below. With cyber fraud on the increase, we suggest you mail, use an overnight service or hand-deliver any items containing banking or other private information and not send via email.)**

_OnPoint_ _____    _323075880_ _____
Bank Name                               FEDWIRE Routing No.

_Andrew Burton_ _____    XXXXXXXXXXXXXXXXXXXXXXX
Name on Account                              Account No.

Any further instructions: _____

***NOTE THIS ONLY APPLIES IF FUNDS ARE WIRED:*** By signing below, I/We hereby authorize First American Title Insurance Company (First American) to obtain a consumer report about me/us to validate our identities and the information we submit in connection with this transaction. This authorization terminates the earlier of: (i) the conclusion of the transaction, including the successful transfer of funds to the intended recipients; or (2) 180 days from the date this authorization is provided. If the authorization given is received via e-mail, my/our typed name(s) below represents said signature and authorization and is intended by me/us to be valid in original, faxed, copied, or electronic form.

Date:_____

_____

Andrew A. Burton

Best Phone No:_____
Forwarding Address: _____
                   _____



## First American

### First American Title Company of Oregon
**775 NE Evans Street**
**McMinnville, OR 97128**
**(503)472-4627 - FAX (866)800-7294**

### AFFIDAVIT
### Existing Construction

File No: **1031-3047789 (MWG)**                    Date: **May 02, 2018**

**STATEMENT UNDER OATH REGARDING POSSESSION AND REPAIRS OR ALTERATIONS**

Given to **First American Title Company of Oregon** and/or its duly authorized agent ("**FirstAm**"), in consideration of its/their issuance of a policy or policies of title insurance.

Regarding Property described as:

**LEGAL DESCRIPTION:** Real property in the County of Yamhill, State of Oregon, described as follows:

**Lot 1B, Block 2, MARIE RAE ADDITION to the City of McMinnville, County of Yamhill and State of Oregon.**

UNDER OATH I state:

A.  There are no unrecorded leases or other agreements concerning the right to possess any portion of the property **(including, without limitation, any agreement where the seller(s) will continue to occupy the property after closing)**, and no person or entity (other than the undersigned) possesses, or has the right to possess, any portion of the property, except: _____. *If None, check here* [X].

B.  No person or entity has an option to purchase, option to lease, right of first refusal, right of first offer or similar right with respect to all or any portion of the property, except: _____. *If None, check here* [X].

C.  No repairs, alterations or improvements have been made to the property during the 75 days preceding the date of this affidavit, except: _____. *If None, check here* [X].

D.  **For a refinance transaction**, none of the proceeds of the loan will be used towards the repair, alteration or improvement of the property, except: _____, anticipated to cost approximately $_____. *If None or if Not Applicable, check here* [X].

E.  If repairs, alterations or improvements have been made to the property within the last 75 days, or will be made to the property prior to closing, I/we agree as follows:

I/We shall indemnify, defend and hold **FirstAm** harmless from and against any and all claims, liens, losses and damages (including attorneys' fees and costs at trial and on appeal) arising from or out of these repairs, alterations or improvements.

**Exhibit "Q" Page 19 of 21**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

F. I have not purchased on credit, or borrowed against any crops to purchase, any fixtures attached to the building(s) or other structure(s) located on the property **(including, without limitation, solar panels, water softeners, alarm systems, or HVAC equipment)**, and I have no knowledge of any security agreement with money still owing on such fixtures attached to the building and I have no knowledge of any financing statements that may affect any vendor's interest in contracts, except (list here such purchase made on credit, if any) _____. *If None, check here* [✗].

G. Except as set forth in the Preliminary Report, I/we have not encumbered the property with, or suffered, assumed or agreed to, any mortgages, trust deeds, judgments, tax liens, easements or other liens or encumbrances which still affect the property at this time, except _____. *If None, check here* [✗].

H. No proceeding in bankruptcy or receivership has been instituted by or against any of the undersigned.

I. Except as was previously disclosed to **FirstAm** in the *Tax Assessment Re-Evaluation Affidavit,* I/we have not (i) received any notice from the County concerning a re-evaluation or re-assessment of the property relative to omitted improvements or (ii) made or caused to be made any improvements to the property that require permits without securing necessary permits from City/County, except _____. *If None, check here* [✗].

I/we further agree to indemnify, defend and hold **FirstAm** harmless from and against any and all claims, liens, losses and damages (including attorneys' fees and costs at trial and on appeal) incurred by **FirstAm** as a result of issuing a policy or policies of title insurance based upon the above representations.

_____
Andrew A. Burton

STATE OF     Oregon            )
                                   )ss.
County of     Yamhill           )

This instrument was acknowledged before me on this 25 day of May, 20 18 by **Andrew A. Burton**.

_____
Notary Public for Oregon
My commission expires: 4/30/21

OFFICIAL STAMP
**MICHELLE WYANN GREGOR**
NOTARY PUBLIC-OREGON
COMMISSION NO. 961746
MY COMMISSION EXPIRES APRIL 30, 2021

# SELLER'S CERTIFICATION AS TO FOREIGN OR NON-FOREIGN STATUS UNDER FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA") (26 U.S.C. 1445)

File No:1031-3047789 **Property: 1590 SW Harbor Drive, McMinnville, OR 97128**

For purposes of this form the following definitions apply:

1. Seller – the person(s) that holds the legal title to a U.S. real property interest under local law.
2. Transferor – the person(s) that is/are the party(ies) treated as the transferor(s) under IRC Section 1445. The Seller may or may not be deemed to be the Transferor for purposes of withholding under FIRPTA.

**All items in this form must be completed by each Seller or Transferor. All Sellers/Transferors must have a taxpayer identification number (TIN) even if they CANNOT provide this certification and FIRPTA withholding must be done. A TIN is not an indication that the Seller/Transferor is a resident alien or U.S citizen.**

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor is foreign.

*To inform the transferee whether withholding of tax is required upon my disposition of a U.S. real property interest, the undersigned hereby certifies the following (complete appropriate section and sign at the bottom):*

## EACH SELLER MUST COMPLETE AND SIGN HIS/HER OWN FORM.

1. Seller/Transferor IS (    ) IS NOT ( X ) a foreign person for purposes of U.S. income taxation and as defined in the Internal Revenue Code and Income Tax Regulations. *A resident alien is considered a U.S. Person. (If you are a foreign person, withholding will be done unless another exemption applies.)*
2. My TIN (Social Security Number) is ___544 89 5611___
3. My full legal name is ___Andrew Burton___
4. My home address is ___1590 SW Harbor Dr McMinnville, OR 97128___

Seller/Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee or Qualified Substitute and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalty of perjury I declare that I have completed this certification and to the best of my knowledge and believe it is true, correct, and complete.

___5/25/18___

Date

Andrew A. Burton

# Exhibit "R"

Exhibit "R" Page 1 of 9



1

2

3

4

5

FILED & ENTERED

MAR 14 2011

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY egarcia   DEPUTY CLERK

6          UNITED STATES BANKRUPTCY COURT

7          CENTRAL DISTRICT OF CALIFORNIA

8              LOS ANGELES DIVISION

9

10   In re:                              Case No. 2:10-bk-11181 ER

11    Dan Haggerty's International Products, Inc.,   Chapter 11
     d/b/a Precision Grilles,

12                                        **MEMORANDUM OF DECISION**

13                                        Date:  February 2, 2011
                                          Time:  10:00 A.M.
14                                        Place: Ctrm. 1568, 15th Fl.
                    Debtor.                      255 E. Temple Street
15                                               Los Angeles, CA 90012

16

17

18          On February 2, 2011, the Court held a hearing on Confirmation of the Debtor's First

19   Amended Chapter 11 Plan ("Plan")(Dkt. # 108). Appearances were as stated on the record.

20

21   **I.      Facts and Procedural Background**

22          ABCO objects to confirmation of the Debtor's Plan for several reasons. First,

23   ABCO contends that the Plan cannot be confirmed as it fails to satisfy the requirements of §

24   1129(a).

25          Section 1129(a)(1) provides that a plan may be confirmed only if it complies with

26   applicable provisions of the Bankruptcy Code. If a plan fails to comport with § 524(e), it cannot

27   be in compliance with applicable provisions of the Code. Article XII of the Debtor's plan

28   provides:

-1-

*The order confirming the plan (or the plan as amended) shall act as a temporary injunction restraining any creditor, party-in-interest or any third party from pursuing any officer, director or shareholder of the Debtor on account of any claim based on a guaranty for so long as the Debtor is making payments pursuant to the Plan.*

*On Plan confirmation, all creditors having an Allowed Claim shall be temporarily enjoined, pursuant to 11 U.S.C. §105, from proceeding against any officer, director, shareholder, employee, or other responsible person of Debtor, individually, or in an official capacity, to collect all or any portion of an Allowed Claim. This injunction is to remain in effect only so long as the Debtor complies with the terms of the Plan concerning payment of claims. Should the Debtor be in violation of Plan payment terms and the violation remains uncured for a period of 30 days after receipt by Debtor of written notice from any party affected by such violation, the affected party may apply to the Bankruptcy Court to dissolve the temporary injunction as to the affected party. The Bankruptcy Court shall have exclusive jurisdiction to extinguish or modify the temporary injunction.*

*To the extent they may have any liability, officers, guarantors, and directors shall not be discharged or released from any liability for such claims and debts under the Plan, however, absent further order of the Court, the exclusive remedy for payment of any claim or debt so long as the plan is not in default as described above shall be payment through the Plan. The temporary injunction is not meant to discharge any third party's liabilities.*

The Court's February 1, 2011 Tentative Ruling denied confirmation of the Debtor's Plan on the basis that the temporary injunction provision "runs afoul of § 524(e)" and therefore the Plan could not be confirmed with the inclusion of this provision. However, at the conclusion of the February 2 hearing, the Court took the matter under submission for further review. After

-2-

1  careful review and analysis, the Court vacates the Tentative Ruling and makes the following

2  findings and conclusions.

3

4  **II.    Discussion**

5     **A.    The Power of the Court to Affect Third Party Liability**

6     A bankruptcy court is endowed with the power, pursuant to 11 U.S.C. § 105(a), to "issue

7  any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

8  title." In *In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610 (9th Cir. B.A.P. 1990), the BAP

9  found that § 105(a) did not give the bankruptcy court authority to approve a plan provision for

10  the release of non-debtors. The BAP ultimately held that the plan at issue violated § 524(e),

11  which states that the discharge of the debtor does not affect the liability of any other entity. *Id.* at

12  615-17. Similarly, in *Coronado City Views, LLC v. Regatta Bay, LLC (In re Regatta Bay, LLC)*,

13  2009 U.S. Dist. LEXIS 124995 (D. Ariz. Oct. 30, 2009), the District Court held that a plan

14  provision that would temporarily enjoin creditors from collection efforts against non-debtor

15  parties post-confirmation was prohibited. The Court reasoned that, because the injunction would

16  affect the liability of the non-debtor parties, it would violate § 524(e). *Id.* at *12.

17

18     However, the Court does not find the reasoning in those decisions persuasive, because it

19  is not rooted in a plain reading of the statutory language. Section 524(e) reads, in pertinent part,

20  "...*discharge* of a debt of the debtor does not affect the liability of any other entity on, or the

21  property of any other entity for, such debt" (emphasis added). Based upon a plain reading of the

22  language of § 524(e), it is apparent that other courts have misinterpreted this section to be

23  overbroad when in fact it very narrowly relates only to the discharge. In this case, there is no

24  nexus between the discharge of the Debtor and the issuance of the temporary injunction. Simply

25  because the discharge provision of the Bankruptcy Code *does not* affect third party liability does

26  not mean that the court *cannot* use § 105(a) to create such an effect, so long as it is not in direct

27  conflict with another provision of the Code. Therefore, a bankruptcy court has the power to

28

-3-

1   issue an order affecting the liability of non-debtor third parties, under § 105(a), because such an

2   order does not conflict with § 524(e).

3

4       Alternatively, the Court finds that the temporary injunction in this case does not even

5   affect the *liability* of non-debtors on the Guaranty. Though the plan—if confirmed—would

6   temporarily enjoin Creditor ABCO ("ABCO") from pursuing third party non-debtor Robert

7   Rester ("Rester") for those sums being paid to it under the Plan, Rester's ultimate liability to

8   ABCO on the Guaranty is not affected. If the Reorganized Debtor defaults on the Plan, the

9   temporary injunction would terminate and ABCO would be free to pursue Rester on the

10  Guaranty for any amounts owed. Furthermore, if any portion of ABCO's claim is not allowable

11  in this bankruptcy case, but is otherwise recoverable pursuant to the Guaranty, ABCO would be

12  free to pursue Rester for any amounts not being paid under the Plan. Therefore, the temporary

13  injunction does not affect the liability of non-debtors on the Guaranty, and is consequently *not* in

14  violation of § 524(e) of the code, even if this Court were to adopt the holding in *Rohnert Park*.

15  *See In re Seatco, Inc.*, 257 B.R. 469, 475 (N.D. Tex. Bankr. 2001) (holding that a temporary

16  injunction in a plan did not affect the *liability* of non-debtors on the Guaranty).

17  **B.    The Unusual Circumstances Test**

18

19      Based on the foregoing, the Court concludes that a temporary injunction prohibiting a

20  creditor's suit against a non-debtor during the bankruptcy case is permissible in order to facilitate

21  the reorganization process in accord with § 105, though only under unusual circumstances. *See*

22  *In re Zale*, 62 F.3d 746, 761 (5th Cir. 1995) (dicta). "These circumstances include (1) when the

23  non-debtor and the debtor enjoy such an identity of interest that the suit against the non-debtor is

24  essentially a suit against the debtor, and (2) when the third-party action will have an adverse

25  impact on the debtor's ability to accomplish reorganization. When either of these circumstances

26  occur, an injunction may be warranted." *Id.*

27      In this case, the Debtor has satisfied the unusual circumstances test. Rester guaranteed

28  payment of the Debtor's obligations to ABCO. Debtor and Rester enjoy an identity of interest

-4-

1   such that a suit against Rester is a suit against the Debtor.  Rester has testified that if the

2   temporary injunction was not permitted, he would be forced to focus on the litigation and raise

3   monies for defense from any source possible, including the Debtor. Rester Declaration

4   Supporting Confirmation, at 7. The resulting financial drain on the Debtor would affect plan

5   payments as well as Rester's ability to focus on the Debtor's business. Further, Rester asserts

6   that if he were to lose his stock in the Debtor as a result of a judgment entered in the litigation,

7   the business would ultimately fail because it depends on his knowledge and contacts in the

8   industry. Id. Thus, an action against Rester would have an adverse impact on the Debtor's ability

9   to reorganize.

10        **C.**     **Standard for Imposing Injunctive Relief**

11

12       Lastly, the Court must also consider the four factors governing the issuance of temporary

13   injunctions.  The factors are as follows: "(1) a substantial likelihood that the movant will prevail

14   on the merits; (2) a substantial threat that the movant will suffer irreparabble injury if the

15   injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened

16   harm an injunction may cause to the party opposing the injunction; and (4) that the granting of

17   the injunction will not disserve the public interest." *See Commonwealth Oil Ref. Co. v.*

18   *U.S.E.P.A. (In re Commonwealth Oil Ref. Co.)*, 805 F.2d 1175, 1189 (5th Cir. 1986).

19         **(1) Reasonable Likelihood of Reorganization**

20

21       In the Court's February 2, 2011 Tentative Ruling, it states that "[b]ased on the Debtor's

22   cash flow projections and the Debtor's historical cash flow, the Court is not convinced that the

23   Debtor will be able to meet its obligations under the Plan." However, the Court is persuaded by

24   the fact that all voting creditors, aside from ABCO, have now voted in favor of the Debtor's

25   Plan. The creditors' confidence in the Debtor's reorganization reassures the Court that the parties

26   most at risk believe that the Debtor can reorganize and emerge from this case in a financially

27   sound manner.

28

1       Further, this standard "is not a high burden for the debtor." *In re Excel Innovations, Inc.*,

2   502 F.3d 1086, 1097 (9ᵗʰ Cir. 2007). Where all creditor classes agreed with the Debtor's Plan, as

3   is the case here, the court found this standard was met. *In re Linda Vista Cinemas, LLC*, 2010

4   Bankr. LEXIS 4259,  at *19 (Bankr. Dist. Ariz. November 24, 2010).  However, because the

5   Court still has some doubts about the likelihood of the Debtor's successful reorganization, it

6   concludes that this factor does not weigh for or against approving the temporary injunction.

### (2) Irreparable Injury to the Movant

7

8       Without the temporary injunction, the Debtor's reorganization will be significantly

9   jeopardized, as Rester may need to drain the Debtor in order to fund his defense to the litigation.

10  Rester Declaration Supporting Confirmation, at 7. Further, Rester himself may end up in Chapter

11  7 proceedings because other than his stock interest in the Debtor and a house with no equity, he

12  has minimal assets to defend against collection efforts. Brief in Support of Confirmation, at 18. If

13  a creditor were to acquire a judgment against Rester, and foreclose on his stock interest in the

14  Debtor, Rester would likely cease involvement with the Debtor. Id. at 2. Because Rester is

15  essential to the successful reorganization of the Debtor, the Court finds that if the temporary

16  injunction is not issued, there is a substantial threat of irreparable injury to the Debtor. This

17  weighs in favor of approving the temporary injunction.

18

### (3) Injury to the Movant Outweighs Harm to Enjoined Parties

19

20      Although the Court has determined that substantial harm may result to the Debtor absent

21  the temporary injunction, this harm must be balanced against the harm that may result to the

22  enjoined parties as a consequence of the injunction. The Court's February 1, 2011 Tentative

23  Ruling stated that:

24

25          *Finally, the five-year injunction provided for in the Plan, extends until well after the*

26          *expiration of the four-year statute of limitations for claims based on a written*

27          *guaranty. Thus, the Court finds that the injunction in this case operates as a* de facto

28

-6-

*discharge and thus, the equities do not weigh in favor of approving the Plan with the
inclusion of this provision.*

Contrary to the Court's Tentative Ruling, it became clear at the February 2, 2011 hearing that the statute of limitations would not act as a *de facto* discharge because ABCO has already commenced state court litigation against Rester. Further, the state court will toll the statute of limitations during the period the temporary injunction is in effect. *See* CAL. CIV. PROC. CODE § 583.340(b) (Deering 2011)(stating that "[i]n computing the time within which an action must be brought to trial pursuant to this article, there shall be excluded the time during which any of the following conditions existed…(b)[p]rosecution or trial of the action was stayed or enjoined.") As a result, the Court's prior concern that the temporary injunction would cause severe detriment to the enjoined parties is non-existant.

The Court does acknowledge that the enjoined parties will be delayed in their ability to pursue Rester for their claims and will receive minimal distribution on their claims under the Plan. However, in a liquidation, these creditors would receive  no distribution from the Debtor and very little, if anything, from Rester. Brief in Support of Confirmation, at 18. Under the Plan, they stand to receive approximately 7.5%. First Amended Plan, at 10. Additionally, in the event there is a default under the Plan that remains uncured, the injunction will be dissolved and the enjoined creditors are free to pursue Rester. Also, as previously discussed, Rester's ultimate liability to the enjoined parties remains unaffected by the Plan. Based on these considerations, the Court concludes that the harm to the Debtor, the inability to reorganize, outweighs the harm to the enjoined parties. Because the temporary injunction will ensure at least some benefit to the enjoined creditors, the Court finds that the balance of hardships weighs in favor of the injunction.

**(4) Public Policy**

The temporary injunction will facilitate the Debtor's successful reorganization, which serves the public interest. Public policy favors fewer reorganizations, which means that

1  stabilizing the Debtor and increasing the likelihood of its successful reorganization is in the

2  public interest. *See In re Linda Vista Cinemas, LLC*, 2010 Bankr. LEXIS 4259,  at *20. This

3  factor weighs in favor of the temporary injunction.

4
      **III.    Conclusion**
5
           For the above reasons, the Court concludes that the temporary injunction provided in the
6
   Debtor's First Amended Plan is proper, and ABCO's objection to confirmation on these grounds
7
   is OVERRULED. A continued confirmation hearing will be held on April 26, 2011 at 10:00am
8
   to address ABCO's remaining objections to confirmation. The Court will enter an order
9
   consistent with this Memorandum of Decision.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    DATED: March 14, 2011                          _____
                                                      United States Bankruptcy Judge
27

28

# CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2018, I served the following:

(1) PLAN CONFIRMATION MEMORANDUM FOR CONFIRMATION HEARING AND REQUEST THAT THE COURT APPROVE NON-MATERIAL MODIFICATION

(2) DECLARATION OF KEITH BOYD IN CONNECTION WITH DEBTOR'S PLAN CONFIRMATION MEMORANDUM FOR CONFIRMATION HEARING AND REQUEST THAT THE COURT APPROVE NON-MATERIAL MODIFICATION; AND

(3) DECLARATION OF ANDREW BURTON IN SUPPORT OF DEBTOR'S PLAN CONFIRMATION MEMORANDUM FOR CONFIRMATION HEARING AND REQUEST THAT THE COURT APPROVE NON-MATERIAL MODIFICATION

by depositing in the United States mail at Encino, California full and complete copies thereof, by first class mail, postage prepaid, or email transmission where indicated, addressed to the following:

<u>via Manual Service (first class mail and as described below):</u>

Creekside Homes, Inc. (via Email)
c/o Andrew Burton
219 NE Hwy 99W
McMinnville, OR 97128

<u>Largest Unsecured Creditors</u>:

~~Amcraft, Inc.~~
~~Greg White~~
~~1015 NE Alpine Ave~~
~~McMinnville, OR 97128-4017~~
**Service to counsel by ECF**

Berkley
Accounts Receivable
PO Box 59143
Minneapolis, MN 55459-0143

~~Canby Drywall~~
~~Rebecca~~
~~PO Box 129~~
~~Canby, OR 97013-0129~~
**Service to counsel by NEF**

CERTIFICATE OF SERVICE                    Page 1 of 4

Ferguson Enterprises
Accounts Receivable
Lockbox 043090 M/S 90
PO Box 4300
Portland, OR 97208
**Service to counsel by ECF**

Globe Lighting
Accounts Receivable
1919 NW 19th Ave
Portland, OR 97209-1735

GM Construction, LLC
15864 Stables Pl
Oregon City, OR 97045-1385
**Per P.O.C.**

Jacobs Heating & AC
Tatiana Tucker
4474 SE Milwaukie Ave
Portland, OR 97202-4724

Lambert's Plumbing Solutions
16705 SW Sunrise Ln
McMinnville, OR 97128-8543
**Per P.O.C.**

LIC Painting Inc
PO Box 501
Gervais, OR 97026-0501
**Per P.O.C.**

Milwaukie Lumber
Ann Berry
13113 NE Fourth Plain Blvd
Vancouver, WA 98682-4934
**Service to counsel by ECF**

Nice Electric
PO Box 636
McMinnville, OR 97128-0636
**Per P.O.C.**

Northwest Door & Supply
c/o Thomas K. Wolf, LLC
Attn: Thomas K. Wolf
5200 SW Meadows Rd., Suite 150
Lake Oswego, OR 97035

Parker Concrete, Inc.
c/o 5530 SE Center St.
Portland, OR 97206
**Per P.O.C.**

PR Drywall
Phil
2730 SE 39th Loop Ste E
Hillsboro, OR 97123-8434

ProBuild
Kelly Bryant
PO Box 507
McMinnville, OR 97128-0507
**Service to counsel by ECF**

Rayborns Plumbing
Rayborn
PO Box 69
Tualatin, OR 97062-0069

Surface Works
Melissa
106 SE 11th Ave
Portland, OR 97214-1315
**Service to counsel by NEF**

Weather Roofing & Construction, Inc.
Rigoberto Fernandez
4093 Hayesville Dr NE
Salem, OR 97305-2304

Secured Lenders:

LoanMe
National Registered Agents, Inc.
780 Commercial St SE Ste 100
Salem OR 97301

Knight Capital Funding III, LLC
Amanda Barton, In-house Counsel
1691 Michigan Ave., Suite 230
Miami Beach, FL 33139-2566
**Per P.O.C.**

Swift Capital
Sergio I. Scuteri, Shareholder
PO Box 5016
Mount Laurel, NJ 08054-5016
**Service to counsel by NEF**

CERTIFICATE OF SERVICE

FC Marketplace, LLC
c/o Becket and Lee LLP
P.O. Box 3002
Malvern, PA 19355-0701
**Per P.O.C.**

I hereby certify that on June 4, 2018, I determined from the United States Bankruptcy Court electronic case filing system that the following parties will be served electronically via ECF:

**Counsel for Kristie Neumayer:** MATTHEW A ARBAUGH matt@arbaugh-law.com

**Local Counsel for Debtor:** KEITH Y BOYD ecf@boydlegal.net, arnold@boydlegal.net

**Counsel for Amcraft, Inc.:** MARK B COMSTOCK mcomstock@ghrlawyers.com, tbrinlee@ghrlawyers.com

**Counsel for ProBuild:** WILLIAM A DREW billd@eoplaw.com

**Counsel for Surface Works, LLC:** EDWARD L. FERRERO ed@ferreropc.com

**Counsel for Debtor:** Steven R Fox emails@foxlaw.com

**Counsel for Canby Drywall, Inc.:** DOUGLAS L GALLAGHER doug@dglawoffice.com, douglasgallagherlawoffice@gmail.com

**Counsel for Ferguson Enterprises, Inc.:** LAURIE R HAGER lhager@sussmanshank.com, ecf.laurie.hager@sussmanshank.com

**Counsel for Sue Chen:** NICHOLAS J HENDERSON nhenderson@portlaw.com, csturgeon@portlaw.com; tsexton@portlaw.com; atrauman@portlaw.com

**Counsel for Swift Financial Corp.:** JAMES P LAURICK jlaurick@kilmerlaw.com, tparcell@kilmerlaw.com

CERTIFICATE OF SERVICE

**Counsel for Douglas and Elaine LeGrady:** HOWARD M LEVINE hlevine@sussmanshank.com, jhume@sussmanshank.com, ecf.howard.levine@sussmanshank.com

**Counsel for U.S. Trustee:** CARLA GOWEN MCCLURG carla.mcclurg@usdoj.gov

**Counsel for Milwaukie Lumber Company:** CRAIG G RUSSILLO crussillo@schwabe.com, lschauer@schwabe.com; docket@schwabe.com; ecfpdx@schwabe.com; bankruptcynotices@schwabe.com; gvance@schwabe.com

**U.S. Trustee:** US Trustee, Portland USTPRegion18.PL.ECF@usdoj.gov

Dated: June 4, 2018                    THE FOX LAW CORPORATION


By__/s/ Sandy Cuevas_____
    Sandy Cuevas,
    Legal Assistant

**The FOX LAW CORPORATION**
Steven R. Fox, California SBN 138808
srfox@foxlaw.com
17835 Ventura Blvd., Suite 306
Encino, CA 91316
(818) 774-3545; FAX (818) 774-3707

**THE LAW OFFICES OF KEITH Y. BOYD**
Keith Y. Boyd, OSB #760701
keith@boydlegal.net
724 S. Central Ave., Suite 106
Medford, OR 97501
(541) 973-2422; FAX (541) 973-2426

Of Attorneys for Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>Creekside Homes, Inc.,<br><br>　　　　　Debtor. | Case No. 17-33893-tmb11<br><br>**DECLARATION OF KEITH BOYD IN CONNECTION WITH DEBTOR'S PLAN CONFIRMATION MEMORANDUM FOR CONFIRMATION HEARING AND REQUEST THAT THE COURT APPROVE NON-MATERIAL MODIFICATION** |

I, Keith Y. Boyd, declare as follows:

1.      I am one of the counsel of record for the Debtor-in-Possession, Creekside Homes, Inc.  My business address is The Law Offices of Keith Y. Boyd, 724 S. Central Ave., Suite 106, Medford, OR  97501.  I am admitted to practice before the Courts of the State of Oregon and before the District Court for the

Declaration of Keith Boyd In Connection With Debtor's Plan
Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification          **Page 1 of 2**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

District of Oregon.

2.   My statements here are within my personal knowledge and if called to testify concerning the contents of my declaration, I could and would do so competently.

3.   On Monday, June 4, 2018, I inspected the electronic banking records for my law firm and I confirmed that the sum of $114,656.25 had been deposited to my firm's client trust account for the benefit of Sarah and Andrew Burton.


Executed on June 4, 2018.

I declare under the penalty of perjury and under the laws of the U.S. of America that the foregoing is true and correct.

_ /s/ Keith Y. Boyd_____
Keith Y. Boyd

Declaration of Keith Boyd In Connection With Debtor's Plan
Confirmation Memorandum For Confirmation Hearing And
Request That The Court Approve Non-Material Modification        **Page 2 of 2**

**THE FOX LAW CORPORATION, INC.**
Steven R. Fox, California SBN 138808
srfox@foxlaw.com
17835 Ventura Blvd., Suite 306
Encino, CA 91316
(818) 774-3545; FAX (818) 774-3707

**THE LAW OFFICES OF KEITH Y. BOYD**
Keith Y. Boyd, OSB #760701
keith@boydlegal.net
724 S. Central Ave., Suite 106
Medford, OR 97501
(541) 973-2422; FAX (541) 973-2426

Of Attorneys for Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>Creekside Homes, Inc.,<br><br>        Debtor. | Case No. 17-33893-tmb11<br><br>**DECLARATION OF ANDREW BURTON IN SUPPORT OF DEBTOR'S PLAN CONFIRMATION MEMORANDUM FOR CONFIRMATION HEARING AND REQUEST THAT THE COURT APPROVE NON-MATERIAL MODIFICATION** |

I, Andrew Burton, declare as follows:

1.      I am the president and, with my wife Sarah Burton, I am the sole shareholder

of Creekside Homes, Inc.  I am its founder.  My business address is 219 N.E.

Highway 99 West, McMinnville, Oregon 97128.  My statements here are based

on my personal knowledge and if called to testify concerning the contents of

Declaration of Andrew Burton In Support Of Debtor's Plan Confirmation
Memorandum For Confirmation Hearing And Request That The Court
Approve Non-Material Modification                                    **Page 1 of 9**

my declaration, I could and would do so competently.

# I.

# AUTHENTICATION AND PERSONAL KNOWLEDGE.

2.     I am the Debtor's President.   I founded the Debtor in 2003 and later incorporated the company.

3.     My roles with the Debtor include the following:

- I oversee office administration.

- I overseeing the creation and maintenance of the Debtor's financial books and records.

- I oversee marketing and incoming calls for work.

- I oversee human resources.

- I oversee customer and public relations.

- I oversee marketing strategies and direction for the company.

- While I have an oversight role as to ongoing projects, they are directly overseen by employees Isaac Mitchell and James Elliott.

- I prepare the estimates for jobs (whether remodels or new homes) with help from others.

4.     I am one of the custodians of the Debtor's books, records, and documents. The Debtor maintains records of its transactions in the regular course of business, and it is the Debtor's practice and procedure to maintain records and to record transactions, acts, and events at or about the time the transaction occurs.   The Debtor relies on these records in connection with its business

dealings.

5.      I oversee the safekeeping of business records including financial records. The Debtor has business records primarily as computer files. If a business record is maintained on a computer, there are safety features which help to keep business records secure. For example, access to many records is limited for most employees. Financial records as one example can only be accessed if one has the necessary password. Only management level personnel have a necessary password. Other employees do not.

6.      The computer is linked to a server. The server backs up the data stored on the computer. The server computer and attachments are maintained in a secured location and has an uninterruptible power supply.

7.      I have personal knowledge of the procedures for creating, receiving, maintaining, storing and retrieving documents and records. The Debtor's business records are received, maintained, stored and retrieved in the ordinary course of the company's course of business. It is the ordinary course of the business to receive, maintain, store and retrieve records including any business records attached as exhibits discussed below. People with knowledge of the records and any exhibits contained below recorded or made these exhibits discussed below. The records were recorded at or near the time of their receipt or creation in the ordinary course of business.

8.      In my declaration, I discuss various exhibits. As to each of them, I either prepared them, someone else prepared them but I inspected them or they were

Declaration of Andrew Burton In Support Of Debtor's Plan Confirmation
Memorandum For Confirmation Hearing And Request That The Court
Approve Non-Material Modification                                    **Page 3 of 9**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

obtained or prepared based on records which I oversee. They are true and correct copies of what they appear to be.

## II.

## Plan Confirmation Requirements.

9. <u>Classification of Unsecured Claims</u>. Certain creditors have asserted claims against my wife, Sarah Burton, and me in addition to asserting claims against the Debtor. These creditors are Knight Capital and Swift Financial. I also believe that Sarah and I signed guaranties with LoanMe and we may have liability to LoanMe as well. Knight sued my wife and me and obtained a judgment against us in Florida. Swift obtained an award from an arbitrator on account of a guaranty. I do not believe that other unsecured creditors, beside the ones named here, have a legal right to sue Sarah or me.

10. <u>Good Faith</u>. I understand that good faith in proposing a plan refers to a reasonable likelihood that a plan will accomplish two objectives of the Bankruptcy Code, to encourage companies to restructure their debt and to preserve companies as ongoing businesses instead of liquidating them.

11. Based on this understanding, I believe that good faith has been shown in various ways including the following:

- Unsecured creditors are being paid a significant dividend.

- Classes 1 (Funding Circle), 2 (small general unsecured claims) and 3 (general unsecured creditors) voted to accept the Plan.

- Class 4 contains three members. Knight and LoanMe voted to accept the Plan. Swift did not. Close to 2/3 in dollar amount voted to accept

Declaration of Andrew Burton In Support Of Debtor's Plan Confirmation
Memorandum For Confirmation Hearing And Request That The Court
Approve Non-Material Modification

**Page 4 of 9**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

the Plan.

- The Plan preserves the property of the estate as one economic unit and does not propose a liquidation.

12.    <u>Liquidation</u>.  The Disclosure Statement contains a liquidation analysis.  I believe that its facts are correct.  In the event that the Debtor was liquidated, and after payment of Funding Circle's first position secured claim, there would be no money available for creditors such as Swift. The liquidation analysis value $72,753 (in the Disclosure Statement at Exhibit "B") vs. the amount which Funding Circle is owed $77,706.57.

13.    <u>Feasibility</u>.  The Debtor's prepetition history showed considerable financial losses.  Those losses decreased early in the case and the past several months have shown positive cash flow and accrued profit.

Attached as exhibits to the "Plan Confirmation Memorandum" are true and correct copies of the following reports:

| | |
|---|---|
| **Exhibit "I"**: An accrual based P&L Statement. | **Exhibit "N"**: A work in progress report. |
| **Exhibit "J"**: A cash based P&L Statement. | **Exhibit "O"**: A bid log. |
| **Exhibit "K"**: A payables report. | **Exhibit "P"**: Actual to budget report. |
| **Exhibit "L"**: A receivables report. | **Exhibit "Q"** Closing Statement on duplex unit and wire instructions from Andrew Burton to Boyd Law Offices |
| **Exhibit "M"**: A balance sheet. | |

14.    The exhibits reflect (1) continued work at appropriate margins, (2) continued

Declaration of Andrew Burton In Support Of Debtor's Plan Confirmation
Memorandum For Confirmation Hearing And Request That The Court
Approve Non-Material Modification                                    **Page 5 of 9**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

bidding for new work, (3) the Debtor incurring losses early in the case but since then showing consistent progress and positive net cash flow and (4) the new value contribution of $65,000 in Mr. Boyd's account. The actual to budget report reflects that though the Debtor did not enjoy the projected gross revenues, the Debtor cuts its COGS and expenses sufficiently that the Debtor's net income closely matched the projected net income.

15.     The Debtor is current in making quarterly payments to the U.S. Trustee.

16.     <u>New Value</u>.  My wife and I propose to infuse $65,000 to retain our interest in the Debtor.  These monies will pay administrative expenses.  Without the new value contribution, the Debtor would be unable to meet its obligations, pay administrative claims <u>and</u> pay other Plan obligations.

17.     The $65,000 comes from the sale of real property which my wife and I sold. The monies are in Mr. Boyd's account and can be used.  The contribution is substantial compared to the amount of unsecured claims in this case.

- Reconciled claims in Class 3 amount to $1,029,797;

- Reconciled claims in Class 4 amount to $288,791;

- Total of Class 3 and 4: $1,318,588. (Disclosure Statement, Exhibit "E")

- The new value contribution is just under 5% of total unsecured claims.

18.     The $65,000 will enhance feasibility of the Plan by paying administrative claims and professionals.  This makes it more likely the general unsecured creditors will be paid.

19.     This Debtor is a small closely held corporation whose future depends on my efforts.  I founded the company and have operated it since then.  In my

Declaration of Andrew Burton In Support Of Debtor's Plan Confirmation
Memorandum For Confirmation Hearing And Request That The Court
Approve Non-Material Modification                                    **Page 6 of 9**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

experience, no one would want to purchase the company from me because its value relies on me being able to work hard for five years to pay plan payments.

20.    The value of the assets on hand at liquidation is $72,753 (Disclosure Statement at Exhibit "B").  The new value contribution, $65,000 is roughly equivalent to the value of the Debtor's assets at liquidation.

21.  <u>Sue Chen's Objection</u>.  Ms. Chen hired the Debtor to build a custom home. She let her insurance lapse.  A fire occurred causing major damage.  The Debtor cut its prices and did its best to assist her.  These steps cost the Debtor dearly and her fire was one of the precipitating causes of this chapter 11 case.

22.  <u>Swift Financial's Objection</u>.  The value of the Debtor's assets at liquidation would be  insufficient for Swift's security interest to attach.  (Liquidation analysis value $72,753 (Disclosure Statement, Exhibit "B") - amount of senior lender's, Funding Circle, claim $77,706.57.)

23.  On a going concern basis, the Debtor's value is what a purchaser with knowledge of the facts would pay for the Debtor.  The relevant facts are the following:

•    I founded the Debtor, bring in the work, oversee marketing and prepare job estimates with help from others.

•    The Debtor will pay all projected disposable income into its Plan.

•    The Debtor's hard assets have relatively little value other than monies ($15,822), receivables ($22,746) and one vehicle ($25,500).

4.    The one considerable asset listed in the Debtor's Schedule B is the value in work in progress - if completed.  Work in progress has value only if

Declaration of Andrew Burton In Support Of Debtor's Plan Confirmation
Memorandum For Confirmation Hearing And Request That The Court
Approve Non-Material Modification                                    **Page 7 of 9**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

the work is done.  All of the net income is projected to go to creditors.

24.     It is an easy conclusion that a purchaser would at most pay the liquidation value of the assets.  No reasonable purchaser will purchase a business which is projected to generate no net income (for the purchaser) for a period of 5 years.

25.     The Temporary Injunction.  I understand that Funding Circle, Knight and LoanMe, voted to accept the Plan and willingly agreed to the issuance of the temporary injunction. Swift voted to reject the Plan and objects to the temporary injunction.

26.     I understand that there is a test the Court will use to decide whether to issue the injunction.  I do not claim to know what the test is.  I will offer some facts.

27.     My wife and I are the Debtor's principals.  We are a young couple with young children.  Our assets include (1) the stock in the Debtor, (2) raw land with equity of $70,000, (3) one half of a duplex with perhaps $150,000 in equity before the homestead exemption.  These assets will appreciate and become more valuable during the five year Plan term.  We lack retirement savings and other substantial assets.  The income from the Debtor is barely sufficient to pay our bills and we lack the money to defend against Swift and other creditors.

28.     Our financial future is tied to the Debtor's success.  Our income is consumed by our monthly bills and expenses.

29.     I am the essential person with the Debtor.  I oversee all administrative functions, I am the face of the company to the world, I handle all sales, marketing and I do the estimating.  A creditor could take a judgment, against

Declaration of Andrew Burton In Support Of Debtor's Plan Confirmation
Memorandum For Confirmation Hearing And Request That The Court
Approve Non-Material Modification                                    **Page 8 of 9**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18

my wife and I and foreclose on the stock in the Debtor. The creditor could also garnish our wages leaving us less incentive to work. Foreclosing on our two remaining properties could prompt us to leave the Debtor as we would need to find new housing and we would need to put our children first. We would be better off being employees.

30. No one at the Debtor has my abilities or drive to manage the business operation I am essential to the successful implementation of the Debtor's proposed Plan.

31. Swift and Knight have pursued their interests in the chapter 11 case and in the state court actions, both before and after the chapter 11 case began.

32. The Debtor is now cash flow positive. The projections of future income and expenses are based on the Debtor's post-petition performance and are likely to be met. At liquidation, the unsecured creditors would receive nothing.

33. If no injunction issues and a creditor holding a claim against us pursues us, then there would be a substantial threat to the Debtor's ability to make plan payments and to reorganize as we would need to protect our children.

34. Though a creditor may be delayed in collections, the properties will appreciate in value and I will be growing the business. I also understand that in the event of a default, a creditor can ask the Court to modify the temporary injunction. Executed on June 4, 2018.

I declare under the penalty of perjury and under the laws of the U.S. of America that the foregoing is true and correct.

_____/s/ Andrew Burton____
Andrew Burton

Declaration of Andrew Burton In Support Of Debtor's Plan Confirmation Memorandum For Confirmation Hearing And Request That The Court Approve Non-Material Modification **Page 9 of 9**

Case 17-33893-tmb11    Doc 169    Filed 06/04/18